Terence J. HORN and Jean
Horn, Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellee.

COMMISSIONER OF INTERNAL
REVENUE, Appellant,

v.

Terence J. HORN and Jean
Horn, Appellees.

Nos. 91–1201, 91–1359.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 11, 1992.

Decided June 26, 1992.

Elias Rosenzweig, with whom Stanley Klein and Michael Weitzner, New York City, were on the brief, for appellants in No. 91–1201 and appellees in No. 91–1359.

Kimberly S. Stanley, Attorney, Dept. of Justice, with whom Shirley D. Peterson, Asst. Atty. Gen., and Gary R. Allen and Kenneth L. Greene, Attorneys, Dept. of Justice, Washington, D.C., were on the brief, for appellee in No. 91–1201 and appellant in No. 91–1359.

Before: EDWARDS, BUCKLEY and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In this case, we are called upon to decide whether Congress intended to authorize a deduction for losses incurred by certain taxpayers who engaged in transactions of a type designed to secure tax benefits while avoiding any economic risk. More specifically, we must decide whether section 108 of the Tax Reform Act of 1984, as amended, permits commodities dealers to deduct losses incurred in the disposition of the legs of straddle transactions, even if the taxpayer's pattern of trading reveals that

the transactions were designed only to produce tax benefits.

The Commissioner of the Internal Revenue Service ("Commissioner") principally claims that the transactions at issue were "economic shams"—*i.e.*, devoid of any "economic substance" or any prospect of true gain or loss—and, therefore, must fall outside section 108. In taking this position, the Commissioner gives no credence to section 108(b)'s irrebuttable presumption that commodities dealers were acting in the course of their trade or business in making these trades. The Tax Court agreed with the Commissioner and found against the taxpayers. On the record before us, the Commissioner's position is plainly and simply wrong. Thus, we are constrained to reverse and remand.

The principal problem that we find with the Commissioner's argument is that it takes the sham transaction doctrine too far. Although useful in determining congressional intent and in avoiding results unintended by tax code provisions, the doctrine cannot trump the plainly expressed intent of the legislature. In this case, the plain meaning of the statute authorizes the claimed deductions, and the Commissioner has utterly failed to provide any other colorable interpretation. Therefore, we reverse the judgment of the Tax Court and remand the case for further proceedings.

## I. BACKGROUND

The parties submitted this case to the Tax Court on cross-motions for summary judgment and on stipulated facts *sub nom. Fox v. Commissioner,* 56 T.C.M. (CCH) 836 (1990). *Fox* was a consolidated case involving twelve taxpayers associated with the Czarnikow–Rionda Company, a subchapter S corporation which regularly traded physi-cal sugar, sugar futures and options on sugar futures for its own account and as a broker, and which was a member of the New York Coffee and Sugar Exchange (now the New York Coffee, Sugar and Cocoa Exchange). *See* Stipulation of Facts ¶¶ 10–12, *reprinted in* Joint Appendix ("J.A.") 11. Each of the taxpayers was assessed a deficiency by the Commissioner based upon similar commodities trades made on the London Metal Exchange ("LME"). *Id.* ¶¶ 4–7, J.A. 8–9.

■ The stipulated facts stated that the "London options transactions at issue in this case are of the same type as those described by the [Tax] Court in" *Glass v. Commissioner,* 87 T.C. 1087, 1104–06 (1986) (section III.A of the court's opinion). The details of the type of transaction involved have been well described by numerous other courts and commentators[1] and, ultimately, are not central to our decision. Briefly stated, the taxpayers primarily utilized an "option-straddle transaction," a two-year commodities market trading strategy which involves an options straddle and two futures straddles. A "straddle" is the simultaneous taking of offsetting positions with different delivery dates in a given commodity.[2] In the first year, the taxpayers engaged an options straddle and a futures straddle, closed out the options straddle and the loss leg of the futures straddle and reestablished the futures straddle by purchasing a futures contract to offset the leg remaining from the original futures straddle. The simultaneous closing of the loss leg and reestablishing the straddle is known as a "switch." In the second year, but not sooner than six months after the switch, the taxpayer closed out the remain-

---

1. *See, e.g., Lerman v. Comm'r,* 939 F.2d 44 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 590, 116 L.Ed.2d 615 (1991); *Dewees v. Comm'r,* 870 F.2d 21 (1st Cir.1989); *Yosha v. Comm'r,* 861 F.2d 494 (7th Cir.1988); *Miller v. Comm'r,* 836 F.2d 1274 (10th Cir.1988). *See generally* Robert A. Rudnick & Thomas A. McKenna, *The Empire Strikes Back: Update on Pre–1981 Commodity Straddles,* 4 J. TAX'N INVESTMENTS 98 (1986); Vincent R. Barrella, *The Tax Straddle Odyssey: The Final Chapter,* 63 TAXES 609 (1985).

2. For example, a trader establishing an options straddle would simultaneously purchase and grant options with different delivery dates for the same commodity. A futures straddle is the simultaneous purchase of long and short positions with different delivery dates for the same commodity.

ing futures straddle.[3]

The strategy yielded an ordinary income loss in the first year and a long-term capital gain in the second year, thereby converting ordinary income to long-term capital gain income and deferring taxation to subsequent years. These results were possible because, at the time, disposing of the offsetting legs of a given straddle transaction was not identified as a single taxable event and because the Commissioner treated the disposition of a granted option as creating ordinary income or loss while treating the disposition of a purchased option as creating capital gain or loss.[4] These results were desirable not only because the real cost of money always makes tax deferral preferable but also because, at the time, the tax on long-term capital gain was much lower than the top marginal rate on ordinary income. *See, e.g.,* 26 C.F.R. §§ 1.1, 1.1201, 1.1234 (1978) (tax rates). Finally, because the legs of a straddle represent opposite sides of an interest in a given commodity, straddle transactions substantially reduce market risk, although they do not eliminate it completely; thus, the strategy could be counted upon to produce the desired tax results.

These "tax straddle" transactions were extremely widespread in the middle and late 1970s. The Commissioner responded in 1977 by issuing a revenue ruling which held that straddle transactions would be treated as single events—that the legs of a straddle would be identified and gains and losses from the legs would be netted whether or not disposition occurred in a single year, *see* Rev.Rul. 77–185, 1977–1 C.B. 48—and by issuing a huge number of notices of deficiencies. The Commissioner's actions regarding straddles engaged in

on the LME eventually resulted in *Glass v. Commissioner,* the largest consolidated action in Tax Court history, which involved approximately 1400 taxpayers. In 1981, in the Economic Recovery Tax Act of 1981 ("ERTA"), Pub.L. No. 97–34, 95 Stat. 172 (1981), the Congress also responded to the tax straddle phenomenon, eliminating the strategy by requiring identification of straddles and unitary treatment of the disposition of coordinate legs. However, the legislation was wholly prospective, and the Commissioner and the taxpayers who had been assessed deficiencies continued to battle over pre-ERTA tax straddle transactions; the Commissioner claimed that the transactions were wholly tax-motivated sham transactions while the taxpayers claimed that the transactions were genuine, were not undertaken solely for tax purposes and were legal.

In 1984, in an attempt to clarify the law governing pre-ERTA straddles and to eliminate the backlog of pre-ERTA cases in the Tax Court, Congress passed section 108 of the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 630–31 (1984) ("section 108"). Section 108 provided that, for all pre-ERTA straddles, losses incurred from closing out legs of straddles would be allowed in the year of disposition only if the straddle was entered into for profit. *Straddles executed by commodities dealers were rebuttably presumed to be for profit.* See 98 Stat. at 630. In 1986, Congress amended section 108 to allow the loss in the year of disposition when the straddle was entered into for profit *or* in a trade or business; Congress also strengthened the presumption for commodities dealers by making it irrebuttable that they acted in a trade or business. Tax Reform Act of 1986, Pub.L. No. 99–514, § 1808(d), 100

---

**3.** At times, the taxpayers would utilize an "option-hedge" transaction which was similar to the option-straddle transaction. In the option-hedge strategy, the taxpayer's initial position was a straddle formed by the granting of an option and the purchase of an offsetting futures contract. When the option was closed out, the straddle was reestablished ("switched") by the purchase of a futures contract. *See Glass,* 87 T.C. at 1106.

**4.** *See Dewees,* 870 F.2d at 24 (citing Priv.Ltr.Rul. 7404080200A (Apr. 8, 1974)); *cf. Yosha,* 861

F.2d at 497 ("*Why* the seller's gain or loss should be thought different in character from the buyer's beats us, but there it is, and taxpayers were entitled to take advantage of this curiously asymmetrical treatment of the different legs of a straddle before Congress eliminated the asymmetry."). Congress has eliminated this disparate treatment. *See* I.R.C. § 1234 (1988) (disposition of granted option creates a capital gain or loss).

Stat. 2817 (1986). As amended, section 108 now reads, in primary part, as follows:

(a) GENERAL RULE—For purposes of the Internal Revenue Code ..., in the case of any disposition of 1 or more positions—

(1) which were entered into before 1982 and form part of a straddle, and

(2) to which the amendments made by [ERTA] do not apply,

any loss from such disposition shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business.

(b) LOSS INCURRED IN A TRADE OR BUSINESS—For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business.

I.R.C. § 1092 note (1988) (Treatment of Certain Losses on Straddles Entered Into Before Effective Date of Economic Recovery Tax Act of 1981).[5]

The *Glass* case dealt with taxpayers who were not commodities dealers and who had engaged in pre-ERTA tax straddle transactions on the LME. The Tax Court found that the transactions were without economic substance—that is, they were engaged in solely for the expected tax benefits and without any expectation of or reasonable prospect for true economic gain. *See* 87 T.C. at 1153–77. The *Glass* decision has been affirmed by each circuit which has considered the issue.[6] Subsequent to *Glass*, the Tax Court considered two cases

involving taxpayers who claimed to be commodities dealers, *Cook v. Commissioner*, 90 T.C. 975 (1988), *aff'd*, 941 F.2d 734 (9th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 172, 116 L.Ed.2d 135 (1991), and the case on appeal here, *Fox v. Commissioner*.

In *Fox*, the taxpayers asserted that the stipulated facts proved them to be commodities dealers and that they were entitled to the deductions the Commissioner had disallowed by virtue of section 108. The Commissioner answered that appellants were. not commodities dealers, but moved for summary judgment on the theory that, even if the taxpayers were commodities dealers, they would not be entitled to take the deductions claimed. The Tax Court agreed with the IRS. It held that there existed a material issue of fact regarding whether the taxpayers were commodities dealers, 56 T.C.M. (CCH) at 866–67; the Horns do not challenge that ruling here. The court also held that the transactions "lack[ed] economic substance," 56 T.C.M. (CCH) at 867, and therefore fell outside section 108. Furthermore, because the trades were specifically planned to create tax benefits without any economic risk, the Tax Court found them to be "prearranged." *Id.* at 868. Therefore, there were no genuine losses to which section 108(b)'s presumption for commodities dealers could apply.

Following a proceeding to determine the precise assessment against the taxpayers, *Kazi v. Commissioner*, 61 T.C.M. (CCH) 1759 (1991), other taxpayers appealed to the Second and Third Circuits and the Horns appealed both to the Second Circuit and to this court.[7] The Second and Third

**5.** These provisions, being solely retroactive, have never been codified. For ease of reference, we will cite the amended provisions simply as "§ 108."

**6.** *Bohrer v. Comm'r*, 945 F.2d 344 (10th Cir. 1991); *Lee v. Comm'r*, 897 F.2d 915 (8th Cir. 1989); *Dewees v. Comm'r*, 870 F.2d 21 (1st Cir. 1989); *Friedman v. Comm'r*, 869 F.2d 785 (4th Cir.1989); *Keane v. Comm'r*, 865 F.2d 1088 (9th Cir.1989); *Ratliff v. Comm'r*, 865 F.2d 97 (6th Cir.1989); *Killingsworth v. Comm'r*, 864 F.2d 1214 (5th Cir.1989); *Kirchman v. Comm'r*, 862

F.2d 1486 (11th Cir.1989); *Yosha v. Comm'r*, 861 F.2d 494 (7th Cir.1988).

**7.** The Horns apparently filed at least two petitions for redetermination of a deficiency with the Tax Court. At the time they petitioned for redetermination of the deficiency assessed with respect to tax years 1975 and 1976, they apparently resided in New York. However, when they petitioned for redetermination of the deficiencies assessed for 1977–1979, they apparently resided in Hong Kong. *See* I.R.C. § 7482(b)(1) (1988) (venue for an appeal from the Tax Court

Circuits found in favor of the Commissioner. *See Gardner v. Comm'r*, 954 F.2d 836 (2d Cir.) (per curiam), *cert. denied*, —— U.S. ——, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992); *Lerman v. Comm'r*, 939 F.2d 44 (3d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 590, 116 L.Ed.2d 615 (1991); *see also Massey v. Comm'r*, 950 F.2d 723 (3d Cir. 1991) (per curiam) (table) (affirming *Kazi* ).

## II. ANALYSIS

■ Section 108(a) provides that pre-ERTA losses resulting from the disposition of one leg of a straddle transaction "shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, *or* if such loss is incurred in a transaction entered into for profit." § 108(a) (emphasis added). Section 108(b) provides that every straddle loss incurred by a commodities dealer "shall be treated as a loss incurred in a trade or business." § 108(b). This case requires us to decide whether the statute means what it says—*i.e.*, that all losses incurred by a commodities dealer in the disposition of the legs of a pre-ERTA straddle shall be allowed. We hold that it does.

Although the result in this case seems straightforward to us, our judgment is offered with some trepidation in light of the contrary conclusions reached by three sister circuits, the Tax Court and the Commissioner. However, after reading the statute and the legislative history, we began with the question, "If section 108(b) does not authorize the deduction claimed here, what is its purpose?" After considering the decisions of the other courts which have struggled with this issue and the briefs and argument on behalf of the Commissioner, we can find no satisfactory answer to that question.

To be sure, the courts and the Commissioner have provided persuasive arguments that section 108(b) ought not say what it says—that the statute as we would read it authorizes a tax benefit for a small class of taxpayers who may have engaged in the transactions at issue for no reason other than the tax benefits. Nevertheless, to construe the section as these courts and the Commissioner do would read it completely out of existence. Barring constitutional infirmity, Congress undoubtedly has the power to grant beneficial tax treatment to economically meaningless behavior, if indeed that is what happened here. The canon against reading a statute in a way that creates absurd results and the sham transaction doctrine are merely judicial devices for divining and effectuating congressional intent, not for supplanting it. Thus, we must reverse the Tax Court's judgment in this case.

## A. *The Plain Meaning of Section 108*

We think that section 108(b) does everything that it need do to permit commodities dealers to claim the loss the Commissioner disallowed in this case. The irrebuttable presumption matches exactly the loss-permitting condition, "in a trade or business," found in section 108(a). Section 108(b) demonstrates that commodities dealers, apart from other taxpayers who invested in tax straddles, are entitled to special treatment; that special treatment is an *irrebuttable* presumption. Furthermore, although we think it superfluous, an inquiry into the legislative history confirms our reading of the statute.

Section 108(a) enumerates the conditions under which a loss claimed for the disposition of one leg of a straddle transaction shall be allowed in the year in which the disposition is made—if such loss is incurred in a trade or business, *or* "if such loss is

lies in the circuit of the taxpayer's residence at the time he petitions the Tax Court; United States Court of Appeals for the District of Columbia Circuit entertains appeals not falling within general rule). Although the Commissioner prevailed in the Second Circuit with respect to the Horns' 1975 and 1976 taxes, *see Gardner*, 954 F.2d at 836, he has not suggested that collateral estoppel arises with regard to the

Horns' double appeal. *Cf.* 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1278, at 482 (1990) (general rule is that collateral estoppel must be plead or is waived).

Pursuant to stipulation, the Commissioner's cross-appeal in the Horns' 1977–1979 case, which was originally filed in the Second Circuit, was transferred to this court.

incurred in a transaction entered into for profit though not connected with a trade or business." § 108(a) (emphasis added). This language exactly mirrors language in I.R.C. section 165(c). Section 165 governs losses generally, and provides in its opening section that "[t]here shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." I.R.C. § 165(a) (1988). The balance of the section details circumstances in which the subsection (a) deduction will not be allowed, and section 165(c) limits deductions to "(1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) [certain casualty losses]." § 165(c).

Returning to section 108, subsection (b) provides that, "[f]or the purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business." § 108(b). Because section 108(a)'s conditional clause is phrased in the disjunctive, any profit motive inquiry is irrelevant. Therefore, *Glass* and the cases following it, which refuse to recognize the losses because the straddles held no economic risk or possibility of profit, are beside the point.

By contrast, section 108(b) is clearly addressed to commodities dealers, which for summary judgment purposes the Commissioner and the Tax Court assumed the Horns to be. The disposition of the "loss leg" of the straddle does create a "loss": the "loss-leg" contract, which is completely independent of the "gain-leg" contract, is cancelled by expending a larger sum of money than it took to purchase it. The statute makes no distinction between the types of straddle transactions that qualify for treatment under section 108(b); the only relevant consideration is whether the taxpayer was a commodities dealer.

The Conference Committee Report accompanying the 1986 legislation confirms our reading of section 108(b):

If a person qualifies as a commodities dealer, the subsection (b) treatment applies with respect to any position disposed of by such person. It would, for example, apply without regard to whether the position was in a commodity regularly traded by the person, whether it was traded on an exchange on which the dealer was a member, or whether an identical position was re-established on the same trading day or subsequently.

H.R.Conf.Rep. No. 841, 99th Cong., 2d Sess. II–845 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4933. In fact, the reference to "whether an identical position was reestablished on the same trading day or subsequently" demonstrates that Congress was aware of the tax straddle phenomenon. Tax straddle transactions are characterized by the "switch" that simultaneously closes out the loss leg of the initial futures straddle and reestablishes the straddle, thus greatly minimizing if not eliminating the economic risk of the transaction. *See, e.g., Miller*, 836 F.2d at 1276 ("A typical straddle traded for tax purposes will include a switch (and thus is distinguishable), while a typical straddle traded for nontax purposes will not include a switch."). The Conference Report also demonstrates that Congress intended the 1986 amendments, including the section 108(b) presumption, to prompt speedy resolution of the straddle cases still pending before the Tax Court. "Further, the conferees clarify their intent that the Internal Revenue Service bring all outstanding pre-ERTA straddle litigation to a speedy resolution, so that the large docket of cases on this issue may be cleared, in a manner consistent with this legislation." H.R.Conf.Rep. No. 841, *supra*, at II–845, *reprinted in* 1986 U.S.C.C.A.N. at 4933. Thus, Congress intended that commodities dealers not be required to prove their entitlement to section 108(a) treatment; rather, under the statute, it is presumed that they qualified.

*B. The Economic Sham Transaction Doctrine*

■ The Tax Court found the transactions in this case to be "devoid of economic substance," 56 T.C.M. (CCH) at 868, and characterized them as economic shams, *id.*

at 869. By this, the court meant that the taxpayers engaged the transactions in such a way as to create the tax benefits while completely avoiding economic risk, and the Horns do not contest that characterization.[8] Based on this finding by the Tax Court, the Commissioner advances two arguments: (1) when a transaction is an economic sham, section 108 does not apply at all, and, alternatively, (2) transactions which are economic shams do not generate "losses" within the meaning of section 108(a). We reject both of these contentions. The sham transaction doctrine is an important judicial device for preventing the misuse of the tax code; but the doctrine cannot be used to preempt congressional intent. As Government counsel properly conceded at oral argument, Congress has the power to authorize these transactions, whether or not they are economic shams. And the language of section 108(a)—providing that the deduction shall be allowed if the transaction was in a trade or business *or* engaged in for profit—coupled with the irrebuttable presumption of section 108(b), makes it clear that that is exactly what Congress intended to do.

■ The economic sham doctrine generally works to prevent taxpayers from claiming the tax benefits of transactions, which, although they may be within the language of the Code, are not the type of transaction Congress intended to favor. Usually, transactions that are invalidated by the doctrine are those motivated by nothing other than the taxpayer's desire to secure the attached tax benefit. The initial and seminal case for the sham transaction doctrine is *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), where the taxpayer attempted to avoid the tax on dividends by "reorganizing" her personal holding company. Acting within the letter of the tax code, she transferred certain stock to a newly created corporation and very shortly thereafter dissolved the new corporation, taking the stock out as a liquidation distribution. The Court described its inquiry into the substance of the transaction as an attempt to give effect to Congress' intent. "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether to avoid them, by means which the law permits, cannot be doubted. *But the question for determination is whether what was done, apart from the tax motive, was the thing that the statute intended.*" *Id.* at 469, 55 S.Ct. at 267 (citations omitted) (emphasis added).

The Court continued to emphasize the primacy of Congress' intent in *Knetsch v. United States*, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960), where the taxpayer had taken a large nonrecourse loan at 3½% interest to purchase life insurance annuities bearing only 2½% interest. Although the Court upheld the disallowance—"it is patent that there was nothing of substance to be realized by Knetsch beyond a tax deduction," *id.* at 366, 81 S.Ct. at 135—the Court made clear that Congress had the *power* to authorize the deduction.

The petitioners contend, however, that the Congress ... authorized the deductions.... The petitioners thus would attribute to Congress a purpose to allow the deduction of pre–1954 payments under transactions of the kind carried on by Knetsch with the insurance company without regard to whether the transactions created a true obligation to pay interest. Unless that meaning plainly appears we will not attribute it to Congress. "To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose." *Gregory v. Helvering*, [293 U.S. at] 470 [55 S.Ct. at 268]. We, therefore, look to the statute and materi-

---

**8.** We pause to note that we are speaking only of "economic shams"—that is, transactions which actually occurred but which exploit a feature of the tax code without any attendant economic risk. Standing opposed to economic shams are "factual shams"—transactions which either did not occur, did not occur as reported or were performed in violation of some of the background assumptions of commercial dealing, for example arms-length dealing at fair market values. *See Lerman,* 939 F.2d at 48 n. 6 ("A factual sham is one in which the alleged transactions never actually took place. In an economic sham, or sham in substance, the alleged transactions actually took place, but are nonetheless without economic substance.").

als relevant to its construction for evidence that Congress meant in § 264(a)(2) to authorize the deduction of payments made under sham transactions entered into before 1954.

*Id.* 364 U.S. at 367, 81 S.Ct. at 135–36.[9]

■ Thus, the sham transaction doctrine seeks to identify a certain type of transaction that Congress presumptively would not have intended to accord beneficial tax treatment. In this case, the Tax Court determined that the transactions were shams because they were "devoid of economic substance," 56 T.C.M. (CCH) at 868, a conclusion the court reached because it believed the transactions were structured to create the tax benefits sought *and* to eliminate any prospect for economic gain or loss. Although we believe the phrase "devoid of economic substance" to be overly conclusory, we can divine from the cases two general factors to assess in determining whether a transaction was an economic sham: (1) did the transaction have a reasonable prospect, *ex ante,* for economic gain (profit),[10] and (2) was the transaction undertaken for a business purpose other than the tax benefits? *See, e.g., DeMartino v. Commissioner of Internal Revenue,* 862 F.2d 400 at 406 (2nd Cir.1988) ("A transaction is a sham if it is fictitious or if it has no business purpose or economic effect other than the creation of tax deductions."); *Sochin v. Comm'r,* 843 F.2d 351, 354 (9th Cir.) ("courts 'typically focus' on the related factors of whether the taxpayer has shown 1) a non-tax business purpose (a subjective analysis), and 2) that the transaction had 'economic substance' beyond generation of tax benefits (an objective analysis)"; "the consideration of business purpose and economic substance are simply more precise factors to consider in the ap-

plication of this court's traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses"), *cert. denied,* 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988); *Friedman,* 869 F.2d at 792 (" 'To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of profit exists.' ") (quoting *Rice's Toyota World, Inc. v. Comm'r,* 752 F.2d 89, 91 (4th Cir.1985)).

■ For the instant case, it is important to recognize that a transaction undertaken for a nontax business purpose will not be considered an economic sham *even if* there was no objectively reasonable possibility that the transaction would produce profits.[11] "If the taxpayer establishes the existence of a valid business purpose, the sham transaction doctrine is inapplicable." Kent N. Schneider & Ted D. Englebrecht, *The Tax Court's Unified Approach to Analyzing Generic Tax Shelters,* 6 J. Tax'n Investments 308, 310 (1989); *see also id.* at 309 ("a transaction is classified as a 'sham' and is disregarded if it lacks *both* business purpose and economic substance"); Karen N. Moore, *The Sham Transaction Doctrine: An Outmoded and Unnecessary Approach to Combating Tax Avoidance,* 41 Fla.L.Rev. 659, 670 (1989) ("The test inquires into the existence of a business purpose for the transaction and evaluates the economic substance of the transaction. The latter evaluation is to be guided by a more precise test of whether there is a reasonable possibility of a profit. Only if

---

**9.** *See also* Kenneth W. Gideon, *Mrs. Gregory's Grandchildren: Judicial Restriction of Tax Shelters,* 5 Va.Tax Rev. 825, 827 (1986) ("if a court concludes that Congress intends the result sought by a taxpayer, that ends the matter, without regard to whether a judicial test has been offended"; "[c]learly expressed congressional intent must always prevail over the [sham] doctrines").

**10.** Because it is not central to this opinion, we do not confront the problem of how much prof-

it potential or economic risk, relative to the expected tax benefit, is sufficient to take the transaction outside the economic transaction doctrine. *See generally* Gideon, *supra* note 9, at 834–39 (discussing this problem). For our purposes, it is sufficient merely to identify the two prongs of the sham transaction inquiry.

**11.** Here, we mean to differentiate between those business actions which are likely to generate additional net revenues and those that are taken for nonrevenue purposes.

neither test were satisfied would the transaction be considered a sham transaction.").

The Supreme Court's approach in two cases demonstrates the separability of the "business purpose" and the economic gain tests. In *Frank Lyon Co. v. United States,* 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978), the Commissioner sought to disallow depreciation deductions taken by a taxpayer pursuant to a sale-leaseback transaction. The Court found the transaction bona fide and held that "where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties." *Id.* at 583–84, 98 S.Ct. at 1303–04. Similarly, in *United States v. Consumer Life Ins. Co.,* 430 U.S. 725, 736–39, 97 S.Ct. 1440, 1446–48, 52 L.Ed.2d 4 (1977), the Court found that two types of reinsurance arrangements were not shams because they "served [other] valid and substantial nontax purposes," specifically, risk allocation. *Id.* at 739, 97 S.Ct. at 1448.

From the foregoing discussion, we extract the following two propositions: first, the sham transaction doctrine is simply an aid to identifying tax-motivated transactions that Congress did not intend to include within the scope of a given benefit-granting statute; and second, a transaction will not be considered a sham if it is undertaken for profit *or* for other legitimate

nontax business purposes. Given this, we are at a loss to understand the Commissioner's suggestion, adopted by several courts, that the sham transaction doctrine applies independently of section 108.[12] As the Seventh Circuit pointed out in *Yosha,* "the taxpayer [in *Gregory* ] was trying to take advantage of a loophole *inadvertently* created by the framers of the tax code; in closing such loopholes the courts could not rightly be accused of having disregarded congressional intent or overreached." 861 F.2d at 498. The Commissioner's analysis would close off any consideration of whether Congress intended the "loophole."

■ Instead, while following the parties' assumptions that the transactions at issue here were not entered into for economic profit and that no evidence has shown a nontax business purpose, we analyze section 108 to see whether it *nonetheless* authorizes the claimed deductions. The structure of section 108(a) closely tracks the sham transaction doctrine—the loss is allowed if and only if the transaction is entered into for profit or in a trade or business. And, as noted, section 108(b) irrebuttably presumes that straddle trades made by commodities dealers are made in a trade or business. Given the similarity between the statute and the sham transaction doctrine, we find it inconceivable that Congress intended that the "sham" transaction doctrine be laid *over* the statute.[13] Additionally, we have been unable to find *any* case under I.R.C. § 165(c)(1), whose "in a trade or business" test was the basis for that of section 108(a), where a court or the

---

**12.** *See, e.g., Lerman,* 939 F.2d at 52 *("Per Gregory v. Helvering,* it is settled federal tax law that for transactions to be recognized for tax purposes they must have economic substance. Therefore, economic substance is a *prerequisite* to the application of any Code provisions allowing deductions, including section 108.... Because [these transactions] are not recognized for tax purposes, section 108 does not even come into play."); *accord Friedman,* 869 F.2d at 791; *United States v. Atkins,* 869 F.2d 135, 139 (2d Cir.), *cert. denied,* 493 U.S. 818, 110 S.Ct. 72, 107 L.Ed.2d 39 (1989); *Kirchman* 862 F.2d at 1491; *Sochin,* 843 F.2d at 354 n. 6.

**13.** As we have noted, *see supra* note 10, one difficult question is how much profit potential,

compared to the tax benefit, is sufficient to take a transaction outside the economic sham doctrine. Thus, depending on how that question is resolved, section 108(a) may differ somewhat from the sham doctrine, because, under that section as under section 165(c)(2), it is clear that the transaction, if not engaged in a trade or business, must have been engaged *primarily* for profit. *See, e.g., Landreth v. Comm'r,* 859 F.2d 643, 648–49 (9th Cir.1988); *Miller,* 836 F.2d at 1287. Nonetheless, section 108(a)'s dual test clearly addresses the same subject as the economic sham doctrine—whether a given transaction has sufficient "economic substance" to be accorded tax treatment.

Commissioner used the sham transaction doctrine to invalidate a deduction that would otherwise have been permitted by that section. *Cf. Yosha*, 861 F.2d at 498–99 ("This provision [§ 165(c)] can be viewed as codifying the economic substance doctrine for loss deductions, thus placing it beyond the power of judicial re-examination....").

■ Furthermore, we cannot accept the Commissioner's argument that losses created by the transactions at issue are not "losses" within the meaning of section 108(a). First, there can be no doubt that closing out the loss leg of a straddle transaction creates a "loss," as that word commonly is understood. The taxpayer has taken an economic position (purchased an asset) that has decreased in value between the time he acquires it and the time he disposes of it.[14] Before ERTA, no legal or economic necessity *required* a taxpayer to keep both legs of a straddle transaction or to account for the legs as a single unit—each was a separate contract and each could be disposed independently. Sections 108 and 165(c) divide the world between losses that give rise to a deduction and those that do not. Of course, where a taxpayer claims a "loss" which did not exist—either because the transaction did not occur at all or because the disposition did not occur at a lesser value—no "loss" within the meaning of those sections occurs. But, as we explain more fully in section C, *infra*, that emphatically is not the posture of this case. The Commissioner and the Tax Court assumed that, in the first year of the straddle transaction, the taxpayers

did dispose of certain personal property which had become less valuable; they experienced a loss.

Second, given the structure of section 108(a), it would make no sense to read the economic sham doctrine into the word "loss." Under that construction, section 108(a) would allow a deduction for all losses that are not economic shams (which are all losses in transactions entered into for a business purpose or for profit) *if* the transaction is entered in a trade or business or for profit. This is, of course, redundant and nonsensical. Section 108(a) makes it unnecessary to utilize the economic sham doctrine. Thus, section 108(b) does all that it need do for the taxpayers to prevail here—it creates an irrebuttable presumption that a commodities dealer has made his straddle trades in a trade or business, *i.e.*, he has not engaged in an economic sham.

■ Finally, what we have said about judicial use of the sham transaction doctrine applies with equal force to use of the canon of statutory interpretation that statutes should not be read to create "absurd results." *See, e.g., Gardner*, 954 F.2d at 838 (relying on this canon to find for the Commissioner's position); *Lerman*, 939 F.2d at 54–55 (same). The canon is sensible, so far as it goes, but it can only be used to further Congress' intent, not to circumvent it. Section 108(b) clearly gives a commodities dealer special treatment—unlike other taxpayers, commodities dealers need not *prove* that their straddle transactions were made in a trade or business.[15] If, as the Commissioner suggests,

---

**14.** Although a futures contract is not actually resold but rather closed out by the purchase of an offsetting contract, that event, for tax purposes and in economic reality, creates a "loss" or a gain. *See generally* I.R.C. § 1256 (1988) (governing tax treatment of regulated futures contracts); 4 Martin M. Weinstein, et al., Merten's Law of Federal Income Taxation § 21A.01 (1986).

**15.** The Third Circuit in *Lerman* stated that the 1986 amendment to section 108(b), creating the irrebuttable presumption, served (only) to "eliminate any profit motive inquiry for straddle transactions as to dealers." *Lerman*, 939 F.2d at 53. We cannot agree. The amendment to section 108(a), by providing that the loss would be allowed if in a trade or business *or* for

profit, would have been sufficient to accomplish that result. Rather, to paraphrase that court, "section 108(b) prevents the Commissioner from disallowing loss deductions by pointing to evidence that any one dealer did not *act in a trade or business* when engaging in a straddle transaction." *Cf. id.* (our replacement language italicized). Section 108(b) provides an irrebuttable presumption that a commodities dealer acted in a trade or business, *not* that he acted for profit.

Additionally, we think irrelevant the Ninth Circuit's statement in *Cook*, 941 F.2d at 737, that there are certain nontax business purposes for which a commodities dealer might engage in commodities straddles. The question is whether there can be any middle ground between

we require commodities dealers to *demonstrate* that the trades had a prospect of economic gain or a nontax business purpose, then we would completely nullify section 108(b). Congress attempted, in section 108, to do two things: to grant commodities dealers some special status and to bring the large number of pre-ERTA straddle cases to a close. Contrary to this intent, under the Commissioner's interpretation, commodities dealers would be on the same footing as all other taxpayers and the 1986 amendment would have done nothing to speed the disposition of the pending straddle cases. A canon of interpretation cannot nullify part of a statute.

## C. *Fictitious or Prearranged Trading and Trading on Foreign Markets*

Relying on language from the House Report accompanying the 1986 amendments, the Commissioner next argues that section 108 does not apply where the trades establishing the straddle transactions were preplanned to minimize or to eliminate any attendant economic risk or were made on a foreign commodities exchange. We reject these arguments. Even according full strength to the committee report, there is no evidence that the trades here were "fictitious" or "prearranged" within the meaning of the House Report. Additionally, the structure of section 108 itself demonstrates that Congress did not intend to limit section 108's purview to straddle trades made on domestic commodities exchanges.

### 1. *Fictitious or Prearranged Trading*

██ The hook for the Commissioner's argument appears in the House Report accompanying the 1986 amendments to section 108. The committee stated that fictitious or prearranged trades would not qualify for section 108(b) treatment.

> Further, the presumption would not be available in any cases where the trades were fictitious, prearranged, or otherwise in violation of the rules of the exchange in which the dealer is a member.

requiring all commodities traders to justify all of their trades and granting the irrebuttable presumption of legitimacy to all trades. Section

H.R.Rep. No. 426, 99th Cong., 1st Sess. 911 (1985). Based on this language, the Tax Court held that, " '[s]ince the straddle transactions ... were prearranged, causing the transactions to lack economic substance, petitioner incurred no losses to which the per se rule can be applied.' " 56 T.C.M. (CCH) at 869 (quoting *Cook*, 90 T.C. at 986); *see also Lerman*, 939 F.2d at 54 (accepting this argument).

We reject this argument. First, we note that this restrictive language appears only in the House Report, not in the Senate or Conference Reports, and not in the statute itself. *See* H.R.Conf.Rep. No. 841, *supra;* S.Rep. No. 313, 99th Cong., 2d Sess. (1986). Second, and more fundamentally, the Commissioner's argument rests on an erroneous use of the term "prearranged." The Tax Court clearly meant to condemn the transactions here because the precise sequence of trades was *preplanned* to create the tax benefits while eliminating the economic risk. *See* 56 T.C.M. (CCH) at 867–69. As used in the House Report, however, the term "prearranged" must be read against the background of the commodities futures laws, *see* H.R.Rep. No. 426, *supra*, at 911 ("fictitious, prearranged, or otherwise in violation of the rules of the exchange"); and, in that context, "prearranged" trades are *not* simply trades unilaterally preplanned by a broker, trader or investor. The Commodity Futures Trading Commission's ("CFTC") rules require exchanges to "prohibit [floor brokers] from making any purchase or sale which has been directly or indirectly prearranged." 17 C.F.R. § 155.2(f) (1991). In commodities law,

> [a] prearranged trade is generally understood to mean any transaction where its disposition has been agreed to outside the competitive arena. The outcome of the trade may be negotiated off the trading floor, or it may be agreed to privately in the exchange hall, but it is nevertheless prearranged because it has been

108(b) can only be read to suggest that there is no middle ground.

foreclosed to other potential market participants.

1 PHILIP M. JOHNSON & THOMAS L. HAZEN, COMMODITIES REGULATION § 2.36 (1989); *see also In re Mittlestadt*, No. 92–7, 1991 WL 255241, 1991 CFTC LEXIS 447 (CFTC Nov. 26, 1991) (issuing complaint for "prearranged trading" and citing as controlling regulation 17 C.F.R. § 1.38, which requires all trades to be made competitively within the trading floor ring).

There is no evidence in this case that the trades were prearranged within the meaning of the House Report—*i.e.,* arranged noncompetitively between the parties to the transaction. Although the London Metal Exchange is a principal-to-principal market and eighty percent of the trading is on the interdealer market, *see Glass*, 87 T.C. at 1096–97, nothing suggests that those trades are noncompetitive or that the trades at issue in the Horns' returns were made noncompetitively. Many courts have criticized the trading practices prevailing on the LME. *See, e.g., Friedman*, 869 F.2d at 793–95; *Glass*, 87 T.C. at 1160–63. But no court has held that the LME itself was a fraudulent market, and neither party here concedes or proves that the questionable trading practices (as opposed to the pattern of trading) identified in *Glass* applied in this case. *See Glass*, 87 T.C. at 1156–57 (evidence regarding trading practices of the *Fox* taxpayers' brokers on the LME not examined); *id.* at 1172 (assuming that the transactions occurred as claimed by the taxpayers). Additionally, the *Glass* decision uses the term "prearranged" to refer only to the fact that the *series* of trades to be made was predetermined, not to suggest that the price of any given trade was manipulated. *Id.* at 1163 ("What petitioners invested in here with the respective broker/dealers was a prearranged sequence of trading calculated to achieve a tax avoidance objective—not investments held for non-tax profit objectives."). Finally, as described in the next section, section 108 clearly permits losses incurred pursuant to straddles established on unregulated exchanges.

We also emphasize that nothing in the Tax Court's opinion or in the record in this case demonstrates that the trades involved in the Horns' straddles were fictitious. The Commissioner did take the precaution of including a disclaimer in the stipulation that he was not conceding that the trades actually occurred. *See* Preamble to Stipulation of Facts, J.A. 5. But, the parties never introduced any evidence on the issue. Thus, we have no basis to find either that the trades were "fictitious" or that they were factual shams. We have no trouble conceding that taxpayers who claim that certain transactions created losses entitling them to deductions should not receive those deductions if the transactions never occurred. That would be blatant fabrication of a tax return, but that is not this case.

### 2. The Applicability of Section 108 to Offshore Trading

■ Finally, the Commissioner suggests as an alternate ground for affirming the Tax Court that section 108 does not apply to trades made on foreign markets not subject to United States commodity exchange rules. The basis for this argument is the same legislative history quoted above, that "the [section 108(b)] presumption would not be available in any cases where the trades where fictitious, prearranged, or otherwise in violation of the rules of the exchange in which the dealer is a member." H.R.REP. No. 426, *supra,* at 911. Although the Tax Court did not rely on this construction in this case, a majority of the judges of the Tax Court adopted the argument in two concurring opinions in *Cook.* *See* 90 T.C. at 992 (Whitaker, J., with whom Williams, J., joined, concurring in the judgment); 90 T.C. at 993 (Wells, J., with whom Sterrett, Chabot, Parker, Hamblen, Cohen, Jacobs, Wright, and Parr, JJ., joined, concurring).

The committee obviously was concerned with the normal trading pattern of commodities dealers it was intending to benefit. It was only the losses incurred in that normal trading pattern which would present the problem of classification between business and tax motivation. Trading on the London metals exchange does not comport with the

rules of trading in the United States on any of the several domestic commodities futures exchanges. The London options transactions would have been in violation of the rules of the commodities exchanges in this country. The presumption of section 108(b) would, therefore, not apply to trades by petitioner on the London Metal Exchange.

90 T.C. at 992 (Whitaker, J., concurring in the judgment). Judge Whitaker also suggested that section 108's definition of "commodities dealer" as a person trading "regulated futures contracts" indicates that only domestic transactions are covered. *See* § 108(f) (for purposes of section 108, commodities dealer has meaning in I.R.C. § 1402(i)); I.R.C. § 1402(i) (commodities dealer is one who trades section 1256 contracts); I.R.C. § 1256(b) (section 1256 contracts are regulated futures contracts).

The latter argument, based on section 108(f), does not carry the day. Section 108(f) refers only to those *persons* who may take advantage of the section 108(b) presumption; it does not limit the *purposes* for which they may use the presumption. Even if "section 1256 contracts refer[s] to financial transactions which take place on domestic exchanges or in the interbank market in the United States," *Cook*, 90 T.C. at 993 (Whitaker, J., concurring), the balance of section 108 permits all those people engaged in trading regulated futures contracts (commodities traders) to deduct losses from all straddles.

We also reject the former argument asserted as a basis for cabining section 108 to domestic transactions—that the legislative history mentions the rules of the exchange on which the trader is a member. Initially, we emphasize that *nothing* in the *statute* suggests that straddles established on foreign markets do not fall within section 108. Additionally, the balance of section 108 clearly contemplates losses incurred from unregulated straddles. As noted above, section 108(a) allows a loss resulting from "any disposition of 1 or more positions which are entered into before 1982 and form part of a straddle." § 108(a)(1). Section 108(e) defines a "straddle" as follows:

> For purposes of this section, the term "straddle" has the meaning given to such term by section 1092(c) of the Internal Revenue Code ... as in effect on the day after the date of the enactment of the Economic Recovery Tax Act of 1981, and shall include a straddle all the positions of which are regulated futures contracts.

§ 108(e).

A close reading of section 108(e) demonstrates that Congress did not intend to limit section 108(a) to losses incurred in straddle trading on domestic exchanges. "Regulated futures contracts," as used in the last clause of section 108(e), refers to contracts traded in accord with domestic futures exchange regulations. Section 108(g) states that "the term 'regulated futures contracts' has the meaning given to such term by section 1256(b) of the Internal Revenue Code ... (as in effect before the date of enactment to this Act)," § 108(g), and section 1256(b), as of that time, defined "regulated futures contracts" as those contracts traded on domestic boards of trade.

> For purposes of this section, the term "regulated futures contract" means a contract—
>
> (1) with respect to which the amount required to be deposited and the amount which may be withdrawn depends on a system of marking to market; and
>
> (2) which is traded on or subject to the rules of a domestic board of trade designated as a contract market by the Commodity Futures Trading Commission or any board of trade or exchange which the Secretary determines has rules adequate to carry out the purposes of this section.
>
> Such term includes any foreign currency contract.

I.R.C. § 1256(b) (1982) (revised through 1983 amendments). Section 108(e), however, does not define straddles *solely* in terms of "regulated futures contracts." Rather, the section defines straddles by reference to section 1092(c) and then tacks on "regulated futures contracts"; the need to make this specific addition demonstrates that Congress envisioned section 108(a) covering straddles whose component parts

were not necessarily contracts traded on domestic, regulated futures exchanges.

In fact, by referring to section 1092(c) "as in effect on the day after the date of the enactment of" ERTA, section 108(e) specifically includes within the definition of section 108 straddles contracts purchased on unregulated exchanges. Section 1092(c), as it was enacted by ERTA, defined a straddle to include any "offsetting positions with respect to personal property." I.R.C. § 1092(c)(1) (Supp. V 1981); *see also* ERTA, Pub.L. No. 97–34, 95 Stat. at 323–26. Section 1092 expressly included only contracts where neither or only one of the legs was a "regulated futures contract." *See id.* § 1092(d)(4) (where both legs are regulated futures contracts, section 1256 applies).

In sum, section 108(e)'s reference to section 1092(c) brings within section 108(a) straddles on unregulated futures contracts. Section 108(e) combined with section 108(a) means that a loss can be recognized from a disposition of a leg of a straddle whether or not the contracts which constitute the straddle are contracts subject to CFTC rules.

The foregoing leads to the conclusion that section 108 was drafted to provide commodities dealers (defined as those who trade regulated futures contracts) a presumption that their straddles (whether or not those straddles were in regulated futures contracts) were established in a trade or business. By selecting "section 1256 contracts" for the purpose of identifying qualifying commodities dealers while choosing section 1092(c) "as in effect on the day after the date of the enactment of" ERTA to identify the straddle transactions that a qualifying dealer could claim, Congress demonstrated its awareness of trading straddles in unregulated futures con-

tracts and included those straddles within section 108's domain.

### III.  CONCLUSION

For the foregoing reasons, the judgment of the Tax Court is reversed and the case remanded for further proceedings.[16]

---

**16.** Because of our decision on the meaning of section 108, we need not address the Horns' argument concerning "out-of-pocket" expenses. Additionally, we think the Tax Court should address the issue raised by the Commissioner's appeal in the first instance. The Commissioner types his cross-appeal, No. 91–1359, as "a protective cross-appeal, ... in which he requests that should this Court hold that taxpayer is entitled

to deduct his losses, the Court should also hold that the Tax Court's ruling that taxpayer was not required to include the offsetting gains in income must be reversed." Brief for the Commissioner at 50 n. 16; *see Fox,* 56 T.C.M. (CCH) at 869. Taxpayers do not argue with this suggestion and we do not see how our decision could have any other effect.