# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 23, 2019      Decided November 26, 2019

No. 18-1275

ENDEAVOR PARTNERS FUND, LLC AND DELTA CURRENCY
TRADING, LLC, TAX MATTERS PARTNER,
APPELLANTS

v.

COMMISSIONER OF INTERNAL REVENUE,
APPELLEE

---

Consolidated with 18-1276, 18-1277, 18-1278

---

On Appeal from the Decisions
of the United States Tax Court

---

*Adrienne B. Koch* argued the cause for appellants. With her on the briefs were *David L. Katsky*, *Elias M. Zuckerman*, and *Haley E. Adams*.

*Francesca Ugolini*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief was *Judith A. Hagley*, Attorney.

Before: ROGERS and GRIFFITH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Concurring opinion filed by *Circuit Judge* ROGERS.

WILLIAMS, *Senior Circuit Judge*:  Andrew Beer was in the tax shelter business.  His enterprise (referred to by the parties as "the Delta Group" or "Bricolage") sold customers the chance to claim large, artificial losses to offset their income and reduce their taxes.  Partnerships controlled by Beer bought pairs of currency option trades from Deutsche Bank.  Each option trade within the pair amounted to a bet on whether a target currency would appreciate or depreciate within a week.  Together, the two options in each pair yielded a net gain or loss of zero.

Whichever trade won generated a large gain for a partnership in one year; the losing trade created a corresponding loss in a subsequent year.  Partnerships enjoy pass through status, meaning that partners (not the partnership) are liable for the organization's taxes and enjoy any tax benefits.  See 26 U.S.C. § 701.  In this case, an accommodating party absorbed the partnerships' gains, while Beer's customers took advantage of the losses.  See *Endeavor Partners Fund, LLC v. Comm'r*, 115 T.C.M. (CCH) 1540, 2018 WL 3203127, at *4 (T.C. 2018) (describing rules "allegedly" enabling the accommodating party to "defease" the gains).

This case involves three sets of trades in November and December, 2001, generating $144 million in losses a year later.  See *id*. at *14.  By the fall of 2002, the government had gotten wise to this type of tax shelter and scared off Beer's customers, see *Endeavor Partners Fund, LLC*, 2018 WL 3203127, at *14; J.A. 2184, and accordingly Beer used the losses for himself, though he evidently needed only $40 million of the total.  See J.A. 2185.

The Tax Court found that these transactions lacked economic substance—that they were shams designed to look like real world trades without any of the risk or concomitant opportunity for profit.

Though the option trades nominally cost tens of millions of dollars each, Deutsche Bank financed almost all the scheme on credit. According to the Tax Court's findings, the parties structured the transactions to guarantee that, regardless of which trade "won," the options always paid an amount exactly equal to the costs of the Deutsche Bank loan. One half of an option pair paid out in Danish kroner, while the other paid out in euros.

These two currencies are functionally the same; the former was then, and is now, "pegged" to the latter. But currency markets are not perfectly efficient and, apparently, the currencies did not move identically on the open market. To avoid any residual risk that the krone and the euro might fluctuate relative to one another, the Tax Court found, Deutsche Bank and the partnerships agreed in advance to use seven-day forward exchange rates to convert the euro or krone winnings into the currency necessary to pay off the Deutsche Bank loan. See *Endeavor Partners Fund, LLC*, 2018 WL 3203127, at *8, *10, *12, *19. This meant that the trades posed zero risk: No matter which option trade won, the partnerships knew they would receive exactly enough money to pay off the Deutsche Bank loans.

On appeal, the partnerships primarily contest the Tax Court's conclusion that the parties agreed in advance on the exact rates to be used in determining earnings and losses under the option agreements, together with a related evidentiary point. Because the Tax Court did not clearly err in that conclusion—or in any other material respect—we affirm.

4

\* \* \*

On a variety of grounds Congress allows taxpayers the benefit of various deductions, exclusions, and credits. See, e.g., 26 U.S.C. § 165 (permitting taxpayers to deduct losses). These provisions tempt some taxpayers into engaging in transactions that appear to follow the letter of the law but lack any real economic substance.

We review the Tax Court's conclusions that the paired currency option trades amount to shams "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a)(1). This means we examine legal conclusions *de novo* and factual determinations for clear error. See *Green Gas Del. Statutory Tr. v. Comm'r*, 903 F.3d 138, 142 (D.C. Cir. 2018). We may overturn the Tax Court's fact findings only if we come to a "definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

The Tax Court relied for legal principles on our decision in *Horn v. Commissioner*, 968 F.2d 1229 (D.C. Cir. 1992), requiring that to treat a transaction as a sham the IRS must show that it possessed neither (1) any objectively reasonable potential for profit nor (2) any "other legitimate nontax business purposes," *id*. at 1238; see also *id.* (identifying "risk allocation" as one such alternative nontax business purpose); *Endeavor Partners Fund, LLC*, 2018 WL 3203127, at \*17–18 (relying on *Horn*). Looking beyond this case, we note that Congress established its own test in a 2010 amendment to the Internal Revenue Code, see 26 U.S.C. § 7701(o); Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 1409, 124 Stat. 1029, 1068–69 (2010), to be applied prospectively only, see *id*. at 1070.

The partnerships argue that the Commissioner bore the burden of proof at trial. But the Tax Court correctly ruled that "the allocation of the burden of proof in these cases is immaterial" because the governing standard was the preponderance of the evidence. *Endeavor Partners Fund, LLC*, 2018 WL 3203127, at *17; see *Blodgett v. Comm'r*, 394 F.3d 1030, 1039 (8th Cir. 2005). Under a preponderance standard, once both parties have produced their respective evidence, the side with the more persuasive case prevails. See *Blodgett*, 394 F.3d at 1039. As a result, the parties sensibly focus on the facts: if the Tax Court's factual findings were free of reversible error, the judgment of sham transaction is inevitable.

The Tax Court did not clearly err when it concluded the parties fixed the forward exchange rates, ensuring that they could predict the precise amount that the winning and losing trades would pay—and ensuring that the trades had no *ex ante* profit potential and lacked any "other legitimate nontax business purposes," *Horn*, 968 F.2d at 1238. The court relied primarily on three items of evidence.

First, it found that the partnerships and Deutsche Bank "exchanged spreadsheets" that included the mutually agreed rate "for converting kroner to euro" and "kroner and euro into dollars." *Endeavor Partners Fund, LLC*, 2018 WL 3203127, at *9, *10, *12.

Second, when Deutsche Bank closed the three 2001 trades, it did not use the prevailing market exchange rates. See Appellant Br. 47 (admitting that "Deutsche Bank may not have used any of the actual spot rates in effect on the settlement dates"). Instead, Deutsche Bank settled the trades using the same rates listed in the spreadsheets they exchanged.

Third, not once did the partnerships object to the use of the fixed exchange rate instead of the prevailing market spot rate.

6

See *Endeavor Partners Fund, LLC*, 2018 WL 3203127, at \*19. The Delta Group's contemporary silence about Deutsche Bank's use of a pre-agreed exchange rate strongly indicates that the parties agreed to fix the krone-euro rate for purposes of determining option outcomes, eliminating whatever risk (and potential for profit) might have otherwise existed. And at least two other similar sets of trades in which Beer's affiliates engaged in 2000 also recorded no profit or loss. See *id*. at \*6–8; J.A. 1999, 2358, 2634.

The partnerships attack the court's finding of an agreement on rate-fixing, pointing to the testimony of Andrew Beer, the man behind the whole scheme. Beer had offered an innocent explanation of the Deutsche Bank spreadsheets, saying that they didn't represent an agreed forward exchange rate with which to settle the trades, but rather a projection "to ensure that the trades were priced in such a way that any profit or loss would result from [a] change [in the market] and not from an error in pricing in the first instance." See Appellant Br. 18 (paraphrasing Beer's testimony at J.A. 2173–74). We're far from confident we understand what Beer meant to convey. But the account, if believed, would support an inference that Deutsche Bank's use of the forward exchange rate to settle the trades, rather than the spot rate, was pure accident and a deviation from the parties' plans. See *Endeavor Partners Fund, LLC*, 2018 WL 3203127, at \*19.

But the Tax Court did not credit Beer's testimony. *Id.*; see *106 Ltd. v. Comm'r*, 684 F.3d 84, 92 (D.C. Cir. 2012) (noting that the Tax Court's "credibility determinations are entitled to the greatest deference" (quotation and citation omitted)). Indeed, it pointed to a highly implausible assumption underlying Beer's account: "Mr. Beer's testimony presupposes that Deutsche Bank erred in this way, not once, but every time it closed a Delta options trade." *Endeavor Partners Fund, LLC*, 2018 WL 3203127, at \*19.

This leads us to the partnerships' claim of a faulty evidentiary ruling. The Tax Court went on to note that the partnerships did not call "the most logical witness to testify about Deutsche Bank's trading practices," namely someone "from Deutsche Bank." *Id*. The court observed "from this we infer that such testimony would not have been helpful to them." *Id*. As the partnerships see it, the court thus drew an impermissible adverse inference from the absence of a Deutsche Bank witness. And—they argue—this error is fatal, because the court needed that inference to reach the conclusion that the parties rigged the rates.

But studying the court's analysis, we conclude that any error was harmless.

Under the common law formulation, a fact finder (typically, a jury) may but need not draw an adverse inference from the absence of a witness "if a party has it [1] peculiarly within his power to produce witnesses whose testimony would [2] elucidate the transaction." *United States v. Young*, 463 F.2d 934, 939 (D.C. Cir. 1972) (quoting *Graves v. United States*, 150 U.S. 118, 121 (1893)).

The likely Deutsche Bank witnesses clearly had the potential to "elucidate the transaction"—they could directly address the question whether the rate-rigging had been intentional or accidental. *Id.* So the pertinent questions are whether the witnesses were "peculiarly within [the partnership's] power" and, if not, whether the Tax Court's conclusion rested materially on the adverse inference.

On the facts of this case, neither the partnerships nor the Commissioner peculiarly controlled Deutsche Bank's employees. The partnerships' business relationship with Deutsche Bank had long since withered, and the government's non-prosecution agreement with the Bank did not, by itself,

place its employees within the government's power. See *United States v. Tarantino*, 846 F.2d 1384, 1404 (D.C. Cir. 1988) ("[N]o automatic inference of exclusive government control arises from the fact that witnesses are acting as government informants, *or from a grant of immunity from prosecution*." (citations omitted) (emphasis added)). But see *Burgess v. United States*, 440 F.2d 226, 232 (D.C. Cir. 1970) (concluding that "[t]he testimony showed a relationship between the Government and the informer which placed it peculiarly within the power of the Government to produce him"); *United States v. Williams*, 113 F.3d 243, 246 n.2 (D.C. Cir. 1997) (construing *Burgess* as "alleviat[ing] the need for the defense to seek a witness *by subpoena*" to secure a missing-witness instruction).

Some courts have relaxed the common law standard and dropped the requirement that the party against whom an inference is drawn have the witness "peculiarly within his power," thus giving the fact finder fairly broad discretion to draw an inference and to choose the party against whom it is to be drawn. See, e.g., *Wilson v. Merrell Dow Pharm. Inc.*, 893 F.2d 1149, 1152 (10th Cir. 1990) ("When an absent witness is equally available to both parties, either party is open to the inference that the missing testimony would have been adverse to it."); *United States v. Erb*, 543 F.2d 438, 444 (2d Cir. 1976) ("[T]he weight of authority in this circuit and the more logical view is that the failure to produce (a witness equally available to both sides) is open to an inference against both parties." (quotation and citations omitted)); *United States v. Cotter*, 60 F.2d 689, 692 (2d Cir. 1932) (Hand, J.) ("When both sides fail to call a witness who knows something of the facts, their conduct, like anything else they do, is a circumstance which a jury may use."); *State v. Greer*, 922 N.W.2d 312, ¶¶ 18–19 (Wis. Ct. App. 2018) (unpublished).

We have given conflicting signals about whether control over a missing witness is required for a fact finder to draw an inference. Compare *Young*, 463 F.2d at 943 ("But in the in-between case where each side has the physical capacity to locate and produce the witness, and it is debatable which side might more naturally have been expected to call the witness, there may be latitude for the judge to leave the matter to debate without an instruction, simply permitting each counsel to argue to the jury concerning the 'natural' inference of fact to be drawn."), with *United States v. Norris*, 873 F.2d 1519, 1522 (D.C. Cir. 1989) ("Exclusivity or peculiarity of power to produce is [] one of two *necessary* predicates for entitlement to the missing witness instruction." (emphasis added)).

In at least one case involving an agency, we have reversed the National Labor Relations Board when it applied the adverse inference against a party that did not control the witness. *Bufco Corp. v. NLRB*, 147 F.3d 964, 971 (D.C. Cir. 1998). In the course of our (brief) analysis, we also noted that the Board's decision conflicted with its own precedent on the subject. *Id.*

This multiplicity of viewpoints suggests the possibility that we should, in reviewing *agency* decisions, adopt a rule that saves agencies from undue risk of reversal due to their potential failure to estimate correctly what circuit will review a particular decision. Besides reducing the risk of inadvertent error, such a rule would prevent agencies from having to adopt different evidentiary rules depending on the circuit (or, indeed, multiple circuits) in which an appeal may lie. At least where good arguments exist for and against permitting the inference, we might allow an agency leeway to choose its own path.

Though lodged under Article I, the Tax Court is—in one relevant respect—unusual: Congress has specifically directed us to review that court in the "same manner and to the same extent as decisions of the district courts in civil actions tried

without a jury." 26 U.S.C. § 7482(a)(1). This indicates that, even if we were to adopt the rule discussed above generally, we would still have to apply our circuit's case law to Tax Court decisions rather than Tax Court precedent. See generally *Dang v. Comm'r*, 83 T.C.M. (CCH) 1627, 2002 WL 977368, at \*3 (T.C. 2002) (concluding, in an unpublished, non-binding memorandum opinion, that "no adverse inference is warranted" if "a witness is equally available to both parties").

In the end, however, we need not resolve the permissibility of the inference nor the governing source of law on that issue. The error, if any, was harmless. See *Young*, 463 F.2d at 940 (applying harmless error analysis). No reader of the Tax Court's analysis of Beer's testimony in the full context of the documentary evidence can seriously doubt that its observation about the lack of Deutsche Bank witnesses was only a matter of gilding the lily. Cf. William Shakespeare, *King John*, act 4, sc. 2 ("To gild refined gold, to paint the lily . . . Is wasteful and ridiculous excess."). Indeed, examining the record we do not believe any reasonable fact finder would have needed to rely on an adverse inference to tip the scales in the Commissioner's favor. The court had before it a pattern of trades that occurred on at least five different dates (the three in late 2001 at issue in this appeal and two others in 2000). On all five occasions, the partnerships turned not a smidgeon of profit or loss. See J.A. 1999, 2358, 2634. And by Beer's admission the Delta Group never objected to Deutsche Bank's failure to use the market spot rates to close the trades in 2001. See J.A. 2579–80 (stating surprise at learning that the trades did not use the spot rates). Given this sustained pattern of repeated, zero-profit-or-loss transactions, the Tax Court had—and asserted—ample reason to conclude that Beer and Deutsche Bank arranged their scheme to eliminate all risk. Indeed, the pattern evidence was the thrust of the Tax Court's analysis. See *Endeavor Partners Fund, LLC*, 2018 WL 3203127, at \*19. As the evidence appeared to the court to tilt overwhelmingly in favor of the Commissioner,

the partnerships' failure to dig themselves out of the hole by calling Deutsche Bank witnesses must naturally have suggested that the partnerships saw no prospect of help in that quarter. But it also rendered the allusion to these witnesses (and any possible error) harmless.

The partnerships contend the pattern of no-profit-or-loss trades cannot provide evidence of an agreement to rig the rates "unless (at a minimum) it could not be explained by anything else." Appellant Br. 47. Not so. Under a preponderance standard, what matters is that the Tax Court could reasonably find that rate rigging (rather than Beer's account) was the *more probable* explanation for the highly suspicious pattern, not that it was irrefutable. None of the cases to which the partnerships cite, see *id*. at n.25, demands that we overturn the Tax Court's sensible conclusion. See, e.g., *Smith v. Reitman*, 389 F.2d 303, 304 (D.C. Cir. 1967) (concluding that there must be "some basis in the record or in *common experience* to warrant" an inference based on *res ipsa loquitur* (emphasis added) (quotation and citation omitted)).

Finally, the partnerships argue that their trades possessed an independent business purpose, aside from offsetting taxes: Before the Commissioner started cracking down on the practice, the Delta Group had planned to profit from the tax losses by transactions in its tax shelter business. (Ultimately, instead of selling the losses, Beer used them for himself when he ran out of customers.) This seems a splendid new example of *chutzpah*. The business purpose test looks to whether a transaction has any purpose *independent of the resulting tax savings*. If profits from marketing tax losses could be viewed as "independent," the sham transaction rule would apply only to unsophisticated creators of sham transactions (a small group, we suspect).

\* \* \*

The judgment of the Tax Court is

*Affirmed*.

ROGERS, *Circuit Judge*, concurring: I write only to elaborate on how a finding that there was an agreement on the exchange rates eliminated the profit potential of the trades.

As the court explains, one option in a pair would pay out in kroner and the other would pay out in euros. Op. at 3. Equally important, however, is that the premium loan for the option that paid out kroner needed to be repaid in kroner, and the premium loan for the option that paid out in euros needed to be repaid in euros. The fact that the premium loans needed to be repaid in different currencies explains why the rate agreement eliminated any profit potential. Putting aside the negligible payout from the losing option, the partnerships needed to use the payout from the winning option to pay the premium loans for both the winning option and the losing option. Because the two options' premium loans had to be repaid in different currencies, the partnerships needed to make a currency exchange in order to repay one of the premium loans. That currency exchange is the possible source of profit potential, and by agreeing on that exchange rate the partnerships and Deutsche Bank eliminated any profit potential from these trades. *See* Tax Ct. Op. 17–18; *see also* Appellants' Br. 11–12; Appellee Br. 13–15.

Appellants emphasize that if there were no agreement to fix the exchange rates that would be used when the winning option paid out and the partnerships repaid the premium loans, then how far the payouts would go toward covering the loans would depend upon the actual movements of the euro and krone against each other during the week between the trade date and the settlement date. Appellants' Br. 11. How far those payouts would go toward covering the premium loans would also depend upon movements of the euro and krone against the U.S. dollar (because appellants' books reflect U.S. dollar values) during both that initial week and the remaining life of the investment until the smaller payout on the losing option was made. *Id*. at 11–12. In their view, the Tax Court's finding of

rate "rigging" is unsupported by substantial evidence, thus making clear the potential for profit as the deals were structured.

For example, if the krone-denominated loan were the winning loan and the euro-denominated loan were the losing loan, then the partnerships would receive a large payout in kroner and would need to use that payout to repay a loan in kroner and a loan in euros. To repay the latter, the partnerships would need to exchange their remaining kroner (after repaying the krone-denominated loan) for euros. Depending on the exchange rate between the krone and the euro, the krone payout could exceed the euro loan amount, resulting in a gain; or it may fall short of the euro loan amount, resulting in a loss; or it may exactly equal the euro loan amount, resulting in neither profit nor loss. By fixing the rates, the partnerships and Deutsche Bank ensured that the winning payout exactly equaled the premium loans for both options, and thereby eliminated the possibility of profit or loss attendant to this currency exchange.