154 T.C. No. 1

UNITED STATES TAX COURT

BELAIR WOODS, LLC, EFFINGHAM MANAGERS, LLC, TAX MATTERS
PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19493-17.                                Filed January 6, 2020.

P is the tax matters partner of LLC, which claimed on its 2009
return a charitable contribution deduction for a conservation ease-
ment. R commenced an examination of LLC's return and secured
from an IRS engineer a report concluding that LLC had substantially
overvalued the easement.

R's agent sent P a Letter 1807 inviting P to a closing confer-
ence to discuss R's tentative proposed adjustments. The proposed
adjustments, set forth in an accompanying summary report, included
disallowing the charitable contribution deduction and alternative
penalties under I.R.C. sec. 6662(c), (d), and (h). The Letter 1807
explained that all of these adjustments would be discussed at the
conference.

R's Examination Division held two conferences with LLC's
representatives, but no agreement was reached. R's agent finalized a
Civil Penalty Approval Form memorializing R's intention to assert

alternative penalties under I.R.C. sec. 6662(c), (d), and (h). The agent's immediate supervisor signed that form, approving assertion of those three penalties.

R subsequently issued P a 60-day letter disallowing the charitable contribution deduction and asserting the three penalties set forth in the Civil Penalty Approval Form. The 60-day letter offered P the opportunity to appeal these determinations to R's Appeals Office, which P did unsuccessfully. R then issued P an FPAA asserting alternative penalties under I.R.C. sec. 6662(c), (d), and (h), as set forth in the 60-day letter, and a fourth penalty under I.R.C. sec. 6662(e). R's agent did not secure supervisory approval of the fourth penalty before issuing the FPAA.

I.R.C. sec. 6751(b)(1) provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination."

1. <u>Held</u>: R's issuance to P of a Letter 1807 and summary report, setting forth the Examination Division's tentative proposed adjustments and inviting P to a conference to discuss them, did not constitute "the initial determination of * * * [a penalty] assessment" necessitating prior supervisory approval under I.R.C. sec. 6751(b)(1).

2. <u>Held</u>, <u>further</u>, R satisfied the requirements of I.R.C. sec. 6751(b)(1) for the first three penalties because R's agent secured written supervisory approval on the Civil Penalty Approval Form before the 60-day letter was issued to P, formally communicating to P the Examination Division's definite determination to assert those penalties.

3. <u>Held</u>, <u>further</u>, R did not satisfy the requirements of I.R.C. sec. 6751(b)(1) with respect to the fourth penalty because he did not show timely supervisory approval of that penalty.

David M. Wooldridge, Ronald Levitt, Gregory P. Rhodes, and Michelle A. Levin, for petitioner.

Christopher D. Bradley, Jason P. Oppenheim, John W. Sheffield III, and John T. Arthur, for respondent.

OPINION

LAUBER, Judge: This case involves a charitable contribution deduction claimed by Belair Woods, LLC (Belair), for a conservation easement. The Internal Revenue Service (IRS or respondent) issued a timely notice of final partnership administrative adjustment (FPAA) disallowing that deduction in its entirety and determining four penalties. In an earlier report we addressed Belair's failure to attach to its 2009 tax return a fully completed appraisal summary on Form 8283, Noncash Charitable Contributions. We granted in part and denied in part respondent's motion for partial summary judgment on that point. See Belair Woods, LLC v. Commissioner, T.C. Memo. 2018-159.

Currently before the Court is a second round of cross-motions for partial summary judgment. These motions address the question whether timely written supervisory approval was secured for the four penalties at issue, as required by

section 6751(b)(1).[1]  It provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination."  In Clay v. Commissioner, 152 T.C. 223, 249 (2019), we interpreted this provision to require that supervisory approval be secured no later than (1) the date on which the IRS issues the notice of deficiency or (2) the date, if earlier, on which the IRS formally communicates to the taxpayer the Examination Division's determination to assert a penalty and notifies the taxpayer of his right to appeal that determination.

Applying that analysis here, we hold that the transmission by the examining agent to Belair's tax matters partner (TMP or petitioner) of a "summary report" setting forth tentative proposed adjustments, and inviting petitioner to a conference to discuss them, did not constitute "the initial determination of * * * [a penalty] assessment" necessitating prior supervisory approval.  See sec. 6751(b)(1).  Rather, we conclude that the "initial determination" of the penalty assessment was embodied in the 60-day letter issued to petitioner on March 9, 2015, when the Examination Division formally notified Belair that it had concluded its work and,

_____

[1]All statutory references are to the Internal Revenue Code (Code) in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

after considering Belair's arguments, had made a definite decision to assert penalties. Because the examining agent secured supervisory approval of the three penalties listed on the Civil Penalty Approval Form before the Examination Division issued the 60-day letter, we hold that respondent complied with section 6751(b)(1) with respect to those three penalties. Respondent has conceded that timely supervisory approval for the fourth penalty was not secured. We will accordingly grant in part and deny in part each party's motion for partial summary judgment.

## Background

There is no dispute as to the following facts, which are drawn from the parties' motion papers and the attached declarations and exhibits. Belair had its principal place of business in Georgia when its petition was filed.

Belair was formed in late 2008 and has operated at all times as a partnership for Federal income tax purposes. Belair timely filed Form 1065, U.S. Return of Partnership Income, for its short taxable year beginning November 11 and ending December 31, 2009. On that return it claimed a charitable contribution deduction of $4,778,000 for the donation of a conservation easement to the Georgia Land Trust, a "qualified organization" for purposes of section 170(h)(3).

On October 22, 2012, the IRS mailed to petitioner a Letter 1787, Notice of Beginning of Administrative Proceeding. This notice informed petitioner that

"we're beginning our audit of your partnership's federal tax return." The letter was signed by Ellie Pennington, the revenue agent (RA) assigned to conduct the examination.

RA Pennington's activity record indicates that the examination was conducted on a fast track because less than a year remained in the period of limitations when the examination began. On October 23, 2012, RA Pennington referred the case to an IRS engineer for preparation of an appraisal valuing the easement. On November 30, 2012, she received from the engineer a report concluding that Belair had substantially overvalued the easement. Between November 30 and December 17, 2012, she discussed the possible application of penalties with Carl Schneider, her then-supervisor.

On December 18, 2012, RA Pennington sent petitioner a Letter 1807 inviting the TMP (and other partners) to a closing conference to discuss the IRS' proposed adjustments. (RA Pennington, not her immediate supervisor, signed the Letter 1807.) These proposals were detailed in an attached "summary report on the examination," which "explain[ed] all proposed adjustments including facts, law and conclusion." The Letter 1807 indicated that "[a]ll proposed adjustments in the summary report will be discussed at the closing conference" and asked petitioner to propose a date, time, and place for that meeting. The letter instructed the

TMP to "send a copy of the summary report to each partner," together with information concerning the conference.

The enclosed summary report proposed to deny the $4,778,000 charitable contribution deduction in its entirety, proposed a "gross overvaluation" penalty under section 6662(h), and in the alternative proposed penalties for negligence and substantial understatement of income tax under section 6662(c) and (d), respectively. The summary report explained in detail the defenses against these proposed penalties that might be available to Belair, including defenses based on "reasonable cause and good faith," reliance on appraisals, and reliance on professional tax advice. Addressing the "gross overvaluation" penalty, the summary report advised petitioner that "[i]n order to avoid this penalty, the facts and circumstances test of whether the taxpayer (investor) acted in good faith, must be taken into account. * * * The taxpayer's (investor's) purpose for entering into the transaction may be considered. Each investor should establish the purpose for claiming the conservation easement deduction."

The IRS exam team attended an initial conference with Belair's representatives in Atlanta in February 2013. At that conference it was agreed that the IRS engineer would revise his report and that Belair would execute Form 872-P, Consent to Extend the Time to Assess Tax Attributable to Partnership Items, which

would enable discussions to continue.  A second conference was held in May 2014, but no agreement was reached.

At a time not disclosed by the record, RA Pennington completed work on a Civil Penalty Approval Form, which she had initiated when commencing the audit on October 22, 2012.  In the box captioned "Reason(s) for Assertion of Penalty(s)" she wrote:  "The contribution deduction flowing through to the individuals is over-valued by over 8,000%.  No reasonable cause was established.  Discussed the assertion of penalties with the group manager.  He concurred that penalties are applicable prior to the issuance of the summary report."

The Civil Penalty Approval Form includes a section captioned "Penalties Requiring Group Manager Approval" and asks the examining agent to check the "Yes" or "No" box for various penalties.  RA Pennington checked the "Yes" box for the section 6662(h) penalty, indicating her recommendation to assert it as the "primary position."  She also checked the "Yes" box for the section 6662(b) and (c) penalties, indicating her recommendation to assert each as an "alternative." She did not recommend, on the Civil Penalty Approval Form, assertion of any penalty under section 6662(e) for substantial valuation misstatement.

On August 27, 2014, RA Pennington forwarded the case file, including the Civil Penalty Approval Form, to Cheryl Mixon, her then-supervisor.  On Septem-

ber 2, 2014, Ms. Mixon, in her capacity as "Group Manager," signed the Civil Penalty Approval Form, approving assertion of the three penalties listed on that form. There is no evidence that Carl Schneider, RA Pennington's original supervisor, approved in writing at any time--by signing a Civil Penalty Approval Form, a letter, or any other document--the assertion of these three penalties.

On March 9, 2015, the IRS issued petitioner a "TMP 60-Day Letter" (60-day letter). This letter formally communicated to petitioner the Examination Division's decision to assert the tax adjustments determined in the examination and the three penalties listed on the Civil Penalty Approval Form. The 60-day letter offered petitioner the options of accepting the adjustments or appealing them to the IRS Appeals Office (Appeals Office).

Petitioner sought review by the Appeals Office, but its appeal was unsuccessful. On June 19, 2017, the Appeals Office issued petitioner an FPAA disallowing the charitable contribution deduction in its entirety and determining a gross valuation misstatement penalty. In the alternative the FPAA determined penalties for negligence, substantial understatement of income tax, and substantial valuation misstatement under section 6662(e). This was the first time the IRS had communicated to petitioner its intention to assert the section 6662(e) penalty. Respondent has conceded that he cannot show timely supervisory approval as to it.

## Discussion

I.     Summary Judgment

The purpose of summary judgment is to expedite litigation and avoid costly, unnecessary, and time-consuming trials.  See FPL Grp., Inc. & Subs. v. Commissioner, 116 T.C. 73, 74 (2001).  We may grant partial summary judgment regarding an issue as to which there is no genuine dispute of material fact and a decision may be rendered as a matter of law.  Rule 121(b); Elec. Arts, Inc. v. Commissioner, 118 T.C. 226, 238 (2002).  The sole question presented for decision at this stage of the proceedings is whether the IRS complied with the penalty approval requirement of section 6751(b)(1).  The parties have filed cross-motions for partial summary judgment on this question, and we find that it may appropriately be adjudicated summarily.

II.     Analysis

A.     Timeliness of Penalty Approval

Section 6751(b)(1) provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination."  The phrase "initial determination of * * * [an] assessment" appears nowhere else in the Code.  It is what scholars of ancient Greek call a "hapax lego-

menon," a word or phrase that occurs only once in a document or corpus.  Graev v. Commissioner, 149 T.C. 485, 500 (2017) (Lauber, J., concurring), supplementing and overruling in part 147 T.C. 460 (2016).  And the phrase has no ordinary meaning, at least not in tax law, because the words "determine" and "assessment" are not normally joined together.  See Chai v. Commissioner, 851 F.3d 190, 218-219 (2d Cir. 2017) ("[O]ne can determine a deficiency * * * and whether to make an assessment, but one cannot determine an assessment." (internal citations and quotation marks omitted)), aff'g in part, rev'g in part T.C. Memo. 2015-42.

Confronted with this ambiguity, this Court and others have looked to the statute's legislative history as a possible guide to its interpretation.  See id. at 219; Clay, 152 T.C. at 248; Williams v. Commissioner, 151 T.C. 1, 8-10 (2018).  The Senate Finance Committee stated Congress' belief that penalties should not be used to gain inappropriate leverage over taxpayers, but "should only be imposed where appropriate and not as a bargaining chip."  S. Rept. No. 105-174, at 65 (1998), 1998-3 C.B. 537, 601.

Given this legislative purpose, the Second Circuit reasoned in Chai that managerial approval would not be meaningful if deferred until after the taxpayer's liability had been determined, e.g., by a decision of this Court.  To be meaningful, supervisory approval must be secured at a time "when the supervisor has the dis-

cretion to give or withhold it." Chai, 851 F.3d at 220. The Second Circuit accordingly interpreted section 6751(b)(1) to "require[] written approval of the initial penalty determination no later than the date the IRS issues the notice of deficiency (or files an answer or amended answer) asserting such penalty." Id. at 221. In partnership cases, we have ruled similarly that supervisory approval must be obtained no later than the date on which the IRS issues the FPAA. See Palmolive Bldg. Inv'rs, LLC v. Commissioner, 152 T.C. 75, 89 (2019); Sugarloaf Fund, LLC v. Commissioner, T.C. Memo. 2018-181, at *22; Endeavor Partners Fund, LLC v. Commissioner, T.C. Memo. 2018-96, at *65, aff'd, 943 F.3d 464 (D.C. Cir. 2019).

In Clay, we considered whether the "initial determination" of a penalty assessment might occur at an earlier stage of the administrative process, and we held that it could. We interpreted section 6751(b)(1) to require that supervisory approval for a penalty be secured no later than (1) the date on which the IRS issues the notice of deficiency or (2) the date, if earlier, on which the IRS formally communicates to the taxpayer the Examination Division's determination to assert a penalty and notifies the taxpayer of his right to appeal that determination. See Clay, 152 T.C. at 249.

In Clay the penalties were formally communicated to the taxpayers in a revenue agent report (RAR) accompanied by a 30-day letter, which entitled them

to appeal by filing a protest with the Appeals Office.  We concluded that the "initial determination for purposes of section 6751(b) was made no later than * * * when * * * [the Commissioner] issued the RAR * * * proposing adjustments including penalties and gave * * * [the taxpayers] the right to protest those proposed adjustments."  Ibid.  Because the IRS agent neglected to secure supervisory approval for the penalties before the Examination Division, by issuing a 30-day letter, formally communicated to the taxpayers its definite decision to assert penalties, we held that the Commissioner had failed to show compliance with section 6751(b)(1).

In the instant case the 60-day letter determining penalties under section 6662(b), (c), and (h) was issued on March 9, 2015.  That letter, like the 30-day letter in Clay, formally communicated to Belair the Examination Division's definite decision to assert those penalties, thus concluding the Examination Division's consideration of the case.  See Internal Revenue Manual (IRM) pt. 8.19.1.6.8.4(3) (Oct. 1, 2013) ("The 60-day letter is the equivalent of a 30-day letter in deficiency proceedings.  It gives the partners the opportunity to appeal the findings of the examiner.").

Group Manager Mixon, RA Pennington's immediate supervisor, signed a Civil Penalty Approval Form approving assertion of the first three penalties on

September 2, 2014.  That date was more than six months before the 60-day letter was issued.  The IRS thus secured supervisory approval for those penalties before formally communicating to Belair the Examination Division's definite decision to assert the penalties.  Respondent accordingly contends that, with respect to those penalties, he has shown compliance with section 6751(b)(1).

Petitioner contends that supervisory approval was required almost two years before the IRS issued the 60-day letter, viz., on December 12, 2012.  That was the date on which RA Pennington mailed the Letter 1807 inviting the TMP (and other partners) to a conference to discuss the exam team's proposed adjustments, as set forth in an enclosed summary report.  But the summary report did not notify petitioner of a definite decision to assert penalties.  Rather, it set forth the exam team's tentative proposals and invited Belair's partners to a conference to discuss them.  See IRM pt. 8.19.1.6.8.4(2) (Dec. 1, 2006).  The Letter 1807 launched a lengthy communication and fact-gathering process during which Belair had the opportunity to present its side of the story.  Only after that process concluded did the Examination Division finalize its penalty determination by issuing the 60-day letter.

The statute requires approval for the initial determination of a penalty assessment, not for a tentative proposal or hypothesis.  As the Second Circuit noted in Chai, a "determination" denotes a "consequential moment" of IRS action.  See

Chai, 851 F.3d at 220-221 (analogizing the "initial determination" of a penalty to the "first determination made by the Social Security Administration of a person's eligibility for benefits" (quoting Black's Law Dictionary 460 (7th ed. 1999))). The natural place to look for an initial "determination" of a penalty assessment is a document that formally communicates to the taxpayer a definite decision to assert penalties.

As used elsewhere in the Code, the words "determine" and "determination" carry with them a sense of definiteness and formality. In the deficiency context the IRS issues a notice of deficiency when it "determines" that a deficiency exists. Sec. 6212(a). The essential purpose of that document is to provide formal notice that a deficiency "has been determined." Pietz v. Commissioner, 59 T.C. 207, 213-214 (1972). In collection due process (CDP) cases, we review the "determination" of the Appeals Office set forth in a "notice of determination." See sec. 6330(d)(1); IRM pt. 5.1.9.3.9 (Feb. 7, 2014). In each instance, the "determination" is embodied in a written communication to the taxpayer that notifies him of a final IRS decision and of his right to appeal that decision to the Tax Court.

The "initial determination" of a penalty may occur earlier in the administrative process, but it still must be a formal act with features resembling those that a "determination" itself displays. Like the 30-day letter involved in Clay, the "ini-

tial determination" of a penalty assessment will be embodied in a formal written communication to the taxpayer, notifying him that the Examination Division has completed its work and has made a definite decision to assert penalties.

We confronted somewhat similar questions in Kestin v. Commissioner, 153 T.C. __ (Aug. 29, 2019). Kestin involved penalties under section 6702(a) for frivolous tax submissions; these are assessable penalties not subject to deficiency procedures. The IRS examiner initially proposed assessment of penalties on March 18, 2016, by completing Form 8278, Assessment and Abatement of Miscellaneous Civil Penalties. Her immediate supervisor approved that proposal on April 7, 2016, by signing and dating that form. Id. at __ (slip op. at 7). The penalties were assessed on May 2, 2016. We held that the IRS satisfied section 6751(b)(1) by showing timely supervisory approval.

In reaching that conclusion, we considered whether the "initial determination" of a penalty should be deemed to have occurred earlier, on February 3, 2016, when the IRS sent the taxpayers a Letter 3176C. This letter advised the taxpayers that the IRS intended to impose a section 6702(a) penalty and invited them to avoid that result by correcting their frivolous filing.

We held that the Letter 3176C did not constitute an unapproved "initial determination." Id. at __ (slip op. at 26). "Although it gave a stern warning about

the IRS's intention to impose a penalty," the purpose of the Letter 3176C "was actually to invite the taxpayer to make a correction" that could result in the penalty's not being asserted. Ibid. When the Letter 3176C was issued, "one could not 'determine,' initially or otherwise, the application of the penalty," because its application vel non would depend on further input from the taxpayer. Ibid.

We noted in Kestin the ambiguity of the phrase "initial determination of such assessment." But the statute instructs us "to look for a 'determination' of a penalty liability, not just an indication of a possibility that such a liability will be proposed." Id. at __ (slip op. at 27). We held that the Letter 3176C "by its nature * * * is not an 'initial determination' of a penalty assessment" because it "is not an unequivocal 'communication that advises the taxpayer that penalties will be proposed.'" Id. at __ (slip op. at 27-28) (emphasis in Kestin) (quoting Clay, 152 T.C. at 249).

For similar reasons we reach the same conclusion here. The Letter 1807 informed Belair of the exam team's "proposed adjustments," advising that "[a]ll proposed adjustments * * * will be discussed at the closing conference." The summary report explained the penalties at issue and the defenses that might be available to Belair, including defenses based on "reasonable cause and good faith," reliance on appraisals, and reliance on professional tax advice. This docu-

ment surely advised Belair of the possibility that penalties might be proposed.  But it was not "an unequivocal 'communication that advise[d] the taxpayer that penalties <u>will</u> be proposed.'"  <u>Kestin</u>, 153 T.C. at __ (slip op. at 27) (emphasis in <u>Kestin</u>) (quoting <u>Clay</u>, 152 T.C. at 249).

Although the statutory text is ambiguous, we must strive to give as much meaning as possible to the words Congress chose.  Section 6751(b)(1) looks for approval of the "initial determination" of a penalty assessment, not for approval of an RA's "first proposal."  As the Second Circuit stated in <u>Chai</u>, a "determination" denotes a "consequential moment" of IRS action.  <u>Chai</u>, 851 F.3d at 221.  That term clearly is not a synonym for a mere suggestion or indication of a possibility that a penalty might be asserted.

In any IRS examination the RA is charged with gathering information, including facts that may bear on whether assertion of a particular penalty is appropriate.  This may necessitate document requests and other preliminary communications with the taxpayer about the possible assertion of a penalty.  As was true here, the fact-gathering process may include one or more conferences during which the taxpayer will have the opportunity to present facts and tell its side of the story.

In this case, the summary report was sent to petitioner less than two months after the examination began. It informed Belair of the penalties the IRS was considering imposing and of the defenses that might be available to Belair. Belair's entitlement to such defenses was presumably among the topics discussed during the parties' conferences in February 2013 and May 2014. Here, as in Kestin, whether or not a penalty would actually be asserted depended on further input from petitioner.

Considerations of fairness and efficient tax administration dictate that the taxpayer be given an opportunity to submit information bearing on the appropriateness of penalties before the Examination Division finalizes its adjustments. In some circumstances, facts that bear on the appropriateness of penalties may be exclusively in the taxpayer's possession. See, e.g., sec. 6664(c)(3)(B) (requiring taxpayer to show that he "made a good faith investigation of the value of the contributed property" in order to establish defense to valuation misstatement penalty). Section 6751(b) does not require examining agents to get supervisory approval before taking exploratory steps to gather the pertinent facts.

For these reasons, we conclude that the summary report transmitting the exam team's tentative penalty proposals did not require prior supervisory approv-

al.[2]  But the case law sheds little light on what specific action by the IRS affirmatively constitutes the "initial determination of * * * [a penalty] assessment" within the meaning of section 6751(b)(1).  See Chai, 851 F.3d at 221 (concluding that supervisory approval must be secured "no later than the date the IRS issues the notice of deficiency (or files an answer or amended answer) asserting such penalty" (emphasis added)); Clay, 152 T.C. at 249 (concluding that the "initial determination * * * was made no later than" the date on which the IRS mailed the 30-day letter (emphasis added)).

In Palmolive, 152 T.C. at 88, we concluded that a subordinate IRS employee should be considered to have made his "initial determination" to assert penalties "at the time he solicited his supervisor's approval" on the Civil Penalty Approval Form or similar document.  Palmolive involved four penalties.  We held that all four had received the requisite supervisory approval because each "was 'initial[ly] determined' and then approved in writing by a supervisor before being communicated to * * * [the taxpayer]" in the FPAA.  Id. at 89.

Alternatively, we might treat the "initial determination" of a penalty as being made in the notice that embodies, and formally communicates to the taxpayer,

---

[2]For similar reasons, we reject the notion that RA Pennington's oral discussion of penalties with Mr. Schneider, her then-supervisor, in December 2012 should be considered to have been the "initial determination" of the penalties.

the Examination Division's unequivocal decision to assert a penalty. Under this approach, section 6751(b)(1) would be satisfied so long as supervisory approval was secured before that notice was mailed.

This equation of a "determination" with the IRS notice that communicates the determination to the taxpayer is explicit elsewhere in our jurisprudence. In CDP cases section 6330(d)(1) grants us jurisdiction if a taxpayer petitions "within 30 days of a determination under this section." In whistleblower cases section 7623(b)(4) grants us jurisdiction of a "determination regarding an award" if the whistleblower petitions "within 30 days of such determination." Under these provisions, we do not ask on what date an IRS officer made his or her decision in a personal, subjective sense. Rather, we treat the "notice of determination" issued to the taxpayer as "the determination" and compute the 30-day period from the date that notice was mailed. See, e.g., Bongam v. Commissioner, 146 T.C. 52 (2016); Kasper v. Commissioner, 137 T.C. 37 (2011).

We have taken a similar approach in partnership cases. Section 6231(g)(2), for example, provides that TEFRA procedures shall not apply if the Secretary "reasonably determines" (correctly or not) that they do not apply. In Bedrosian v. Commissioner, 143 T.C. 83 (2014), aff'd, 940 F.3d 467 (9th Cir. 2019), we were

required to decide at what point in time the Secretary should be deemed to have made his "determination" to this effect.

We held in Bedrosian that "the FPAA is the IRS' determination," following authorities dating back "to the earliest days of TEFRA litigation." Id. at 107. The taxpayers urged that earlier communications and actions by the IRS exam team amounted to determinations that TEFRA procedures did apply, but we rejected that argument. "These events," we concluded, were "part of the give-and-take of an on-going examination," and none of them "amount[ed] to a determination" that TEFRA procedures applied. Ibid. "To look to the actions within an ongoing exam to find a 'determination' would be an unworkable rule raising any number of problems." Ibid.

Practical considerations support a similar conclusion here. It may be difficult or impossible to ascertain the precise point in time at which an IRS officer should be deemed to have made, in a subjective sense, the "initial determination" that is ultimately embodied in the notice issued to the taxpayer. An RA may have jotted down notes on a legal pad, or had a conversation with a supervisor, indicating that he intended to recommend penalties. An RA may have mentioned the possibility of penalties, with varying shades of conviction, during meetings or

telephone calls.  Or as here, the RA may have forwarded proposed adjustments to the taxpayer in anticipation of a conference.

If events transpiring during informal meetings were deemed critical in ascertaining whether an "initial determination" had been made, difficult evidentiary problems would arise in establishing who said what to whom.  Cf. Palmolive, 152 T.C. at 88 (noting that inferences about the timing of an "initial determination" could amount to "mere speculation").  Indeed, a strategically minded taxpayer could seek to insulate himself from penalties by initiating a discussion of that subject at an early stage of the examination, conscious that the examining agent most likely would not have secured supervisory approval of any penalties by that time.

In the case at hand, we conclude that the "initial determination of * * * [the penalty] assessment" was embodied in the 60-day letter issued on March 9, 2015, by which the IRS formally notified Belair that the Examination Division had completed its work and, after considering Belair's arguments, had made a definite decision to assert penalties.  This approach comports with the statutory text-- generally acknowledged to be ambiguous--and is consistent with our case law and the terminology used elsewhere in the Code.  Because the RA secured supervisory approval of the first three penalties, by the signing of the Civil Penalty Approval

Form, before the Examination Division issued the 60-day letter, we hold that the IRS complied with section 6751(b)(1) with respect to those three penalties.[3]

As we noted in Kestin, the ambiguity of the statute's operative phrase makes interpretation and application of section 6751(b)(1) difficult. Kestin, 153 T.C. at __ (slip op. at 26-27). "[N]o matter how it is interpreted, the statute will achieve only imperfectly the congressional purpose of ensuring 'that penalties [w]ould only be imposed where appropriate and not as a bargaining chip." Ibid. (quoting Chai, 861 F.3d at 219). An RA's reference to penalties at any stage of an examination might be viewed colloquially as a "bargaining chip." But this metaphor from the legislative history cannot displace the statutory text.

Section 6751(b)(1) requires supervisory approval, not for a preliminary proposal, but for the initial "determination" of a penalty. That term has an established meaning in the tax context and denotes a communication with a high degree of concreteness and formality. In a deficiency context such as this, we conclude that the "initial determination" of a penalty assessment--the "consequential moment" of IRS action, as the Second Circuit put it in Chai, 851 F.3d at 220-221--is embodied in the document by which the Examination Division formally notifies the

---

[3]As noted supra p. 9, respondent has conceded that he cannot show timely supervisory approval for the section 6662(e) penalty, which was first communicated to petitioner in the FPAA.

taxpayer, in writing, that it has completed its work and made an unequivocal decision to assert penalties. As Chief Justice Burger wrote in United States v. Boyle, 469 U.S. 241, 248 (1985), we think "[t]he time has come for a rule with as 'bright' a line as can be drawn consistent with the statute." The interpretation we adopt here may help achieve that goal in manner consistent with the statutory text.

B.    Form of Supervisory Approval

Petitioner directs two arguments toward the Civil Penalty Approval Form that Group Manager Mixon signed on September 2, 2014. Petitioner first contends that the penalties should have been approved by Mr. Schneider, RA Pennington's original supervisor, with whom she orally discussed the penalties at the outset of the examination. But as we held in Palmolive, 152 T.C. at 84-86, section 6751(b)(1) does not require approval by a specific person in a particular way. Rather, the statute "mandates only that the approval of the penalty assessment be 'in writing' and by a manager." PBBM-Rose Hill, Ltd. v. Commissioner, 900 F.3d 193, 213 (5th Cir. 2018).

Section 6751(b)(1) provides that the initial determination of a penalty assessment must be approved in writing "by the immediate supervisor of the individual making such determination." Ms. Mixon was RA Pennington's immediate

supervisor when the Civil Penalty Approval Form was forwarded to her. She was thus the appropriate person to sign that form.

Petitioner alternatively contends that Ms. Mixon's signature on the Civil Penalty Approval Form was a nominal act that did not reflect meaningful review, noting that her supervision of RA Pennington began somewhat late in the examination process. Petitioner filed a request for admissions asking respondent to "admit that Ms. Mixon had not discussed the Penalty Approval Form with the examiner prior to Ms. Mixon['s] signing such form." Respondent declined to comply with that request on relevancy grounds, citing Raifman v. Commissioner, T.C. Memo. 2018-101.

In Raifman the record included a Civil Penalty Approval Form signed by the RA's immediate supervisor. Id. at *57. The taxpayers moved to reopen the record to enable them to cross-examine both IRS officials, urging that "the penalty approval form is insufficient to establish whether * * * [the RA and her supervisor] adequately considered the applicability of any reasonable cause penalty defense" that might be available to the taxpayers. Id. at *59-*60. We denied that motion, concluding that "such a line of questioning would be immaterial and wholly irrelevant to ascertaining whether * * * [the Commissioner]

complied with the written supervisory approval requirement of section 6751(b)(1)." Id. at *60-*61.

We reach a similar conclusion here. Section 6751(b)(1) requires only that the initial determination of a penalty assessment be "personally approved (in writing) by the immediate supervisor." As we said in Raifman, "[t]he written supervisory approval requirement * * * requires just that: written supervisory approval." Raifman, at *61. As in Raifman, "[w]e decline to read into section 6751(b)(1) the subtextual requirement" that respondent demonstrate the depth or comprehensiveness of the supervisor's review. Ibid. We have held in numerous cases that the group manager's signature on the Civil Penalty Approval Form is sufficient to satisfy the statutory requirements. See, e.g., McNely v. Commissioner, T.C. Memo. 2019-39; Brown v. Commissioner, T.C. Memo. 2019-30; Dasent v. Commissioner, T.C. Memo. 2018-202; Giunta v. Commissioner, T.C. Memo. 2018-180; Berry v. Commissioner, T.C. Memo. 2018-143.

In this case, the penalty approval form was signed in timely fashion by Group Manager Mixon, the then-immediate supervisor of RA Pennington. It is a fact of life in the IRS (as in any large organization) that staff members change jobs, are reassigned, or retire. The fact that RA Pennington had a different supervisor earlier in the examination is inconsequential. See Palmolive, 152 T.C.

at 84-86. We accordingly hold that, with respect to the three penalties listed in the Civil Penalty Approval Form, the IRS satisfied all of the requirements imposed by section 6751(b)(1).

To implement the foregoing,

<u>An order will be issued granting in part and denying in part each party's motion for partial summary judgment</u>.

Reviewed by the Court.

THORNTON, PARIS, KERRIGAN, BUCH, NEGA, PUGH, and ASHFORD, <u>JJ</u>., agree with this opinion of the Court.

MORRISON, <u>J</u>., concurring:  On the facts of this case, I agree with the opinion of the Court that the 60-day letter was the initial determination to impose the penalties.  However, I do not agree with any suggestion in the opinion of the Court that the initial determination to impose the penalties may only be "a formal written communication to the taxpayer, notifying him that the Examination Division has completed its work and has made a definite decision to assert penalties."  <u>See</u> op. Ct. p. 16.

MARVEL, J., dissenting: This case once again requires that we wade into the mire created by the imprecise text of section 6751(b)(1). See Clay v. Commissioner, 152 T.C. 223 (2019); Graev v. Commissioner (Graev III), 149 T.C. 485 (2017), supplementing and overruling in part Graev v. Commissioner (Graev II), 147 T.C. 460 (2016); see also Chai v. Commissioner, 851 F.3d 190 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42. In an attempt to bring order to the imprecise text of section 6751(b)(1), the opinion of the Court holds that the "initial determination" to assert a penalty was "embodied in the 60-day letter issued on March 9, 2015," because that document "formally notified" petitioner of a "definite decision to assert penalties." See op. Ct. p. 23. In doing so, the opinion of the Court's analysis relies on parts of our section 6751(b)(1) caselaw and a technical reading of the word "determine" as used elsewhere in the Code.

While the opinion of the Court does yeoman's work in its attempt to identify the initial determination that requires written approval, the text of section 6751(b) simply cannot bear the weight. Instead, I contend that the Letter 1807, dated December 18, 2012, and the attached summary report on the examination (collectively, Letter 1807) set forth the initial determination in this case. In that letter, the Internal Revenue Service (IRS) informed petitioner in writing that it

intended to impose a penalty in petitioner's case. Because written supervisory approval was not obtained before the IRS mailed Letter 1807, I would hold that respondent has failed to meet his burden of production as to the penalties asserted.

Section 6751(b)(1) has produced a disproportionate share of this Court's recent reviewed and precedential Opinions. Since Graev II, we have recognized that identifying the moment of "initial determination" requires an inquiry into ever-earlier timeframes. See Graev II, 147 T.C. at 477-478 (initial determination occurred at assessment); Graev III, 149 T.C. at 495 (initial determination occurred no later than the notice of deficiency or amended answer); Clay v. Commissioner, 152 T.C. at 249 (initial determination occurred no later than the revenue agent report proposing adjustments and granting a right to appeal proposed adjustments). This trend is the result of the use of the word "initial" in section 6751(b)(1). The "initial determination" to impose penalties will come at different points in different cases, but it will always be found before the date of the first written assertion of proposed penalties by the IRS. See Graev III, 149 T.C. at 501 (Lauber, J., concurring); see also Chai v. Commissioner, 851 F.3d at 220-221. Our prior cases have recognized this; they demonstrate that the relevant "initial determination" occurs no later than the date on which the examining agent furnishes a report to the taxpayer proposing a penalty requiring section 6751(b)(1)

approval. See Graev III, 149 T.C. at 494-495 ("[W]e conclude that * * * [the] recommendation was the initial determination[.]" (Emphasis added.)); see also Chai v. Commissioner, 851 F.3d at 220-221.

This reading is consistent with the underlying purpose of section 6751(b)(1). Specifically, Congress enacted section 6751(b)(1) to prevent unapproved penalty proposals from being used "as a bargaining chip". See Chai v. Commissioner, 851 F.3d at 219 (quoting S. Rept. No. 105-174, at 65 (1998), 1998-3 C.B. 537, 601). This notion--that unapproved penalty proposals should not be used as leverage--arose in response to testimony explaining the pressure induced at closing conferences of the type called for in Letter 1807. See id.; see also IRS Restructuring: Hearings on H.R. 2676 before the S. Comm. on Finance, 105th Cong. 92 (1998) (statement of Stefan F. Tucker, Chair-Elect, Section of Taxation, American Bar Association) ("[W]e ought to note that * * * penalties * * * are an IRS negotiating tool. * * * If * * * [the taxpayer] do[es] settle, * * * [the IRS] may not assert the penalties."). Letter 1807 invoked the possibility of penalties and invited petitioner to negotiations involving both the proposed substantive adjustments and the proposed penalties. This is precisely the situation for which Congress mandated prior supervisory approval to ensure the appropriateness of any proposed penalties.

The opinion of the Court, nevertheless, concludes that section 6751(b)(1) did not require written supervisory approval before the IRS issued Letter 1807. The opinion of the Court concludes that Letter 1807 lacked the requisite formality to qualify as an "initial determination" and instead views it as an invitation to discuss the proposed penalty. The opinion of the Court finds this notion of formality in a technical construction of the word "determination", as understood through its use elsewhere in the Code. The notion of formality, however, appears nowhere in section 6751(b)(1) or its legislative history. Indeed, this notion is difficult to understand in the context of section 6751(b)(1) because settlement negotiations are, by nature, informal until they generate a final agreement. Every communication from the Commissioner proposing a deficiency and a related penalty–whether it is a preliminary report, a 30- or 60-day letter, or a notice of deficiency--sets forth proposed adjustments, which do not become final until a decision is entered or an assessment is properly recorded.

Section 6751(b)(1) does not reward overly technical readings; it is a unique provision that uses terms of art imprecisely and so should be given a common sense reading. By applying a technical reading, the opinion of the Court will require the Court to engage in an extratextual quest for an appropriate level of formality in the various IRS forms and communications generated in an IRS

examination to decide whether the written approval requirement of section 6751(b)(1) has been met. This quest is not necessary. We should instead require only that which Congress meant to require: that the IRS agent obtain written penalty approval before putting a penalty into play by issuing the first written report to the taxpayer proposing a penalty.

Section 6751(b)(1) is, at best, a difficult statute to parse. In such circumstances, where textual guideposts are few and potentially unreliable, it is tempting to forge a standard that depends on some level of formality. Taken together, however, the text, history, and purpose of section 6751(b)(1) demonstrate that Congress has already established the standard, and it focuses less on formality and more on when the IRS first issues a report to the taxpayer proposing a penalty that is subject to the section 6751(b)(1) approval requirement. In this case, that first written report in the record was Letter 1807. That report injects a proposed penalty into negotiations with petitioner and contains the "initial determination" under section 6751(b)(1).

Because the opinion of the Court concludes that Letter 1807 did not embody the initial determination of a penalty within the meaning of section 6751(b)(1), I respectfully dissent.

GALE, COPELAND, and JONES, JJ., agree with this dissent.

GUSTAFSON, J., dissenting:  Section 6751(b)(1) provides:  "No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination".  (Emphasis added.)  The opinion that the Court adopts today misconstrues the statute in a manner that frustrates and even contradicts its purpose.

The operative term in section 6751(b)(1)--"initial determination of such [penalty] assessment"--is a difficult one.  The majority rightly attends to the word "determination" so as to avoid applying the statute to a mere "tentative proposal or hypothesis."  See op. Ct. p. 14.  However, "determination" is not the only word to be construed here.  Rather, the statute applies to an "initial determination" by an "individual".  (Emphasis added.)  By deciding instead that the statute applies only when "the IRS formally notified" the taxpayer that "the Examination Division * * * ha[s] made a definite decision to assert penalties", see id. p. 23, the Court has veered away from what Congress enacted.

In this case the revenue agent signed a Letter 1807, on letterhead of the Internal Revenue Service Small Business/Self-Employed Division, that referred to "proposed adjustments" given in an attached summary report of the examination (Form 4605-A, "Examination Changes"), and it invited petitioner to attend a

"closing conference". Notably, the "Remarks" on the first page of the

Form 4605-A state: "Accuracy Penalties under section 6662 are included as a

partnership level determination. See Lead Sheet: Gross Overvaluation Penalty".

(Emphasis added.) That "Lead Sheet" states on its front page the "Conclusion"

that "[t]he gross overvaluation penalty is applicable", that in the alternative "[t]he

substantial understatement penalty is applicable", and that further in the

alternative "[t]he negligence penalty is applicable".

In my judgment, that letter with its attachments embodied an "initial

determination" that required written supervisory approval. It is true that the letter

did not reflect "the Examination Division's definite decision to assert the

penalties." See op. Ct. p. 14. But this will be true of many--perhaps all--initial

penalty determinations by an agent who has failed to comply with

section 6751(b)(1) by getting supervisory approval. That very failure makes it

impossible to characterize the unapproved act as "the Examination Division's

definite decision"; but today the Court perversely relieves such an unapproved

"initial determination" of the consequence that Congress intended. The Court

effectively holds that the letter did not require supervisory approval because the

letter lacked supervisory approval.

The statute applies where there has been an "initial determination" by an "individual".  By contrast, the Court today looks to see whether there has been a "definite decision" by the "Examination Division"--a formulation that the majority opinion uses six times.  See op. Ct. pp. 4-5, 13-14, 16, 23.  The opinion of the Court seems to require approval not of an "initial determination" but only of a more final determination.  And it seems to require approval not of a determination by an individual agent but only of a determination by the Examination Division.  That approach will hereafter make it difficult to identify the individual who makes an initial determination and the supervisor who must approve it.

Section 6751(b)(1) was enacted to undo the determinations of individual agents who make unapproved assertions of penalty liability, but the opinion of the Court today seems to hold that these assertions may not need supervisory approval and may not be undone by section 6751(b)(1).  I would hold otherwise.

FOLEY, GALE, MARVEL, URDA, COPELAND, and JONES, JJ., agree with this dissent.